**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD A. RILEY, | : | |
| Plaintiff | : | |
| v. | : | No. 1:00-CV-00485 |
| | : | (Judge Rambo) |
| MARTIN HORN, et al., | : | |
| Defendants | : | |

FILED
HARRISBURG
MAR 15 2001
MARY E. D'ANDREA, CLERK
Per_____ DEPUTY CLERK

### DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN DISPUTE

Defendants, pursuant to Middle District Rule 7.4 and through their counsel, submit that the following facts are material to this action and not genuinely in dispute:

1. Plaintiff is Ronald A. Riley, currently incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon").

2. Defendants are Martin Horn, former Secretary of the Department of Corrections ("DOC"); Frederick K. Frank, former Superintendent at SCI-Huntingdon; Clinton R. Myers, former Deputy Superintendent at SCI-Huntingdon; James Grace, Major of the Guard; Gilbert Levy, a captain at SCI-Huntingdon; Diana G. Baney, Grievance Coordinator at SCI-Huntingdon; Joel Keller, Unit Manager at SCI-Huntingdon; Timothy Launtz, Unit Manager at SCI-Huntingdon; Dennis Buzminsky, a counselor at SCI-Huntingdon, Joseph Stidd, Hearing Examiner; Dennis Hoover, a correctional officer at SCI-Huntingdon; Julia McFadden, a former correctional officer at SCI-Huntingdon; William Ward, Chairman of the Pennsylvania Board of Probation and Parole; and, J. Harvey Bell, a Pardons Case Specialist.

3. On November 4, 1993, while incarcerated at SCI-Huntingdon, Riley was issued Misconduct No. 668566 for assaulting correctional officer Julia McFadden. Riley was found guilty of the misconduct and sanctioned to sixty days disciplinary custody. As a result of the misconduct, he was transferred to SCI-Pittsburgh and a separation was placed against Riley for officer McFadden's protection from contact with him. (See Defendant's Answer to the Complaint ¶¶ 18-21; Unsworn Declaration of Joel Keller ¶ 5.11).

4. In November 1996, officer McFadden was placed on extended sick leave. McFadden did not return to work at SCI-Huntingdon and resigned from her position as a corrections officer on November 18, 1997. (See Unsworn Declaration of Stephen Dougherty ¶ 4). Because McFadden was no longer working at SCI-Huntingdon, Riley no longer had an active separation at the institution. (See Unsworn Declaration of Keller, ¶ 11; Unsworn Declaration of Donald Williamson ¶ 6).

5. On March 2, 1999, the Pennsylvania Board of Probation and Parole recorded that Riley could be paroled to a Community Corrections Center ("CCC"), upon the completion of certain terms and conditions. Riley's release date was established as November 22, 1999. (See Exhibit "A" attached to the Complaint).

6. On March 24, 1999, a memorandum was sent from the Director of Region II, Bureau of CCC to SCI-Pittsburgh advising of Riley's release date and that he was approved to be released in November, 1999, to the Harrisburg Community Corrections Center, located in Harrisburg, Pennsylvania. The March 24, 1999 memorandum further stated that if Riley is not a problematic pre-release case and if the institution's staff recommends parole, arrangements should be made in

accordance with the established procedures for transfer to SCI-Greene for placement in the Outside Units. (Id.).

7. In February of 1999, a Classification 2 ("CL-2") Unit was added at SCI-Huntingdon to begin accepting inmates paroled to CCC's located in Region II. On May 4, 1999, Executive Deputy Commissioner Beard issued a memorandum outlining the procedure for processing inmates accepted for paroled to a CCC who have an acceptance date in the excess of thirty days and who are not problematic cases. Inmates in Region II accepted to a CCC with an acceptance date of thirty days or more were to be transferred to SCI-Huntingdon. (See Unsworn Declaration of Williamson ¶ 4; Keller Declaration ¶ 21).

8. The Harrisburg Community Corrections Center to which Riley was to be paroled is located within the area known to the DOC as Region II. Because Riley's acceptance date into the CCC was more than three months in advance, he was processed to be transferred to the designated institution with outside units within Region II. At the time of Riley's transfer in May of 1999, SCI-Huntingdon was accepting Region II CCC accepted inmates. Riley's institutional level at the time of his transfer was C-2. SCI-Huntingdon houses inmates with classification level 4, 3, 2 and 1 inmates. (Id. ¶¶ 11, 15; Keller Declaration ¶ 21, 23).

9. Once an inmate has been approved to be released to a CCC by the Pennsylvania Board of Probation and Parole ("Board"), it is the duty and responsibility of the DOC to transfer the inmate to the appropriate correctional institution to await placement to the CCC. Neither the Board nor its Chairman has the authority regarding an inmates transfer to a DOC institution. (Williamson Declaration ¶ 14).

10. Donald Williamson, the Diagnostic and Classification Coordinator of the Bureau of Inmate Services, approved and facilitated Riley's transfer to SCI-Huntingdon on May 12, 1999. At the time Riley was transferred to SCI-Huntingdon, officer McFadden was no longer working at the institution and Riley therefore did not have an active separation at SCI-Huntingdon. (Id. ¶¶ 12, 16-17).

11. Shortly after his transfer, Riley met with the Initial Reception Committee at SCI-Huntingdon. Riley's counselor, Dennis Buzminsky, was present at the committee's review. The committee noted Riley's separation from corrections officer McFadden and told Riley that he was separated from McFadden for her protection. It was explained to Riley that since McFadden was on extended sick leave, there was no separation problem. (See Unsworn Declaration of Buzminsky ¶ 6).

12. Subsequent to the IRC meeting, Riley's separation status was investigated by Unit Manager Joel Keller. Keller was informed that McFadden had been out of the institution on disability leave since late 1996 and had resigned from the institution effective November, 1997. (Keller Declaration ¶ 10).

13. Keller then informed Riley that he did not have any active separations at SCI-Huntingdon as the officer he was separated from was no longer working at the institution. (Id. ¶ 11).

14. Riley's counselor also spoke with Riley and once again informed him that his placement at SCI-Huntingdon was proper, as he had no active institutional separations. (See Unsworn Declaration of Buzminsky ¶ 7).

15. At no time before or after Riley's May 29, 1999 misconduct report does Buzminsky recall receiving an Inmate's Request to Staff Member forms from Riley dated May 12, 1999 and

May 23, 1999. If he had received a written request, he would have responded in writing to Riley. In addition, any request that he may have received from Riley would have been placed in his institutional treatment file, the DC-14. No Inmate Request to Staff Member directed to Buzminsky dated May 12, 1999, May 23, 1999 or any other date in May, 1999, or a response can be located. (Id. at 8-10).

16. At no time before or after Riley's May 29, 1999 misconduct does Keller recall receiving an Inmate's Request to Staff Member form from Riley dated May 12, 1999. If he had received such a written request, Keller would have responded in writing pursuant to DOC Administrative Directive and placed it in Riley's institutional file, the DC-15, or in his treatment file, the DC-14. No Inmate Request to Staff Member directed to Keller dated May 12, 1999, or any other date in May, 1999, or a response can be located. (Id. at 8-16).

17. Diana Baney is the Grievance Coordinator at SCI-Huntingdon and is responsible for maintaining records of all grievances filed by inmates. The records are maintained manually as well as in the Inmate Grievance Tracking Systems database. (See Unsworn Declaration of Baney ¶ 5-6).

18. At no time before or after Riley's May 29, 1999 misconduct report does Baney recall receiving an Official Inmate Grievances, dated May 23, 1999 and May 29, 1999. She has no record of receiving these grievances. In addition, she personally reviewed Ronald Riley's institutional file and cannot find any copies of these grievances. Neither a response nor the grievances are in his institutional file. If these grievances had been assigned numbers they would have been recorded on the Inmate Grievance Tracking System. These grievances do not appear on the Inmate Grievance System Tracking System's database. Furthermore, there is no record in the computer or on Riley's

DC-15, institutional record of these grievances being rejected for any reason and returned unprocessed. (Id. at ¶ 9).

19. As Assistant to the Superintendent, Baney also maintains a record of an inmate's request to the Superintendent. In May, 1999, she was the Assistant to Superintendent Frederick K. Frank. If an Inmate Request to Staff Member form was submitted to the Superintendent, she was responsible for tracking the request. No copies or record of an Inmate Request to Staff Members form dated May 12, 1999, directed to Superintendent Frank can be located. (Id. at ¶ 10-12).

20. Correspondence from an inmate to the Secretary of the Department of Corrections is tracked or recorded through an Inmate Tracking System which tracks all correspondence that is received from an inmate directed to the Secretary. In addition to the Inmate Tracking System, the Secretary's office tracks any documents that are directed to the Secretary or his office. (See Unsworn Declaration of Dell ¶ 3).

21. If correspondence is received from an inmate, a copy of the correspondence may be sent to the Deputy Commissioner of the Region where the inmate is housed. This correspondence will then be tracked again by the Deputy Secretary's office. Finally, a copy of all inmate correspondence is filed with the Inmate Record Department of the Department of Corrections. (Id. ¶ 4).

22. No record can be located that former Secretary Horn received any correspondence from Ronald Riley in May or June of 1999. No information can be located on the Inmate Tracking System, the Secretary's correspondence file, the Deputy Secretary's office, or in the Inmate Record Department. (Id. ¶ 5).

23. On May 29, 1999 Officer Dennis Hoover was working at SCI-Huntingdon in the visiting room. Hoover observed that Riley's female visitor's right hand was on his genital area and Riley was covering her hand with his right hand. (See Hoover Declaration ¶ 3).

24. Officer Hoover then issued Riley Misconduct No. A 129076 for Engaging in Sexual Acts with Others or Sodomy and Violations of Visiting Regulation, and Unacceptable Personal Conduct. (Id.).

25. Prior to the May 29, 1999 incident Officer Hoover did not have any contact with Riley, nor was he aware that Riley had assaulted a staff member or that he had any previous separations at SCI-Huntingdon. (Id. ¶ 8).

26. Officer Hoover never made any derogatory or racial comments to Riley on May 23, 1999 or at any other time. Hoover was not working at SCI-Huntingdon on May 23, 1999. (Id. ¶ 7).

27. On June 2, 1999 a hearing was held regarding Misconduct No. A129076. The charges that were filed against Riley were based on Officer Hoover's observation of Riley and his visitor. The charges were not based on activity recorded by the visiting room's video camera. (See Unsworn Declaration of Stidd, ¶ 4).

28. Stidd reviewed Hoover's report which contained his written testimony that he observed Riley's female's visitors right hand on Riley's genital area and that Riley was covering her hand with his right hand and that when Riley and his visitor noticed him, Riley quickly lifted his visitor's hand away from his genitals. Stidd also reviewed Riley's written version and weighed his testimony at the June 2, 1999 hearing. (Id. 6-7).

29. Riley requested that the hearing examiner review the visiting room tape for that day. Stidd denied Riley's request and explained to him that the charges were not based on a review of the

tape; rather, the charges were based on the personal observation of Corrections Officer Hoover. Stidd also denied Riley's request to present two character witnesses and irrelevant to the charges. ( Id. ¶ 8-9).

30.    Stidd relied on the credibility of Officer Hoover's written testimony rather than Riley's version. Based upon information presented, Stidd believed that Riley engaged in unacceptable personal contact during the Mary 27, 1999 visit by allowing his female visitor to deposit her hand on his genitals while Riley covered her hand with his hand. Stidd determined that the conduct was not a sex act and dismissed the charge Engaging in Sexual Acts with Others, or Sodomy and found Riley guilty of a Violation of Visiting Room Regulations, Unacceptable Personal Conduct and sanctioned him to 15 days all restriction and 60 days loss of visiting privileges. (Id. ¶ 10).

31.    Stidd did not view the visiting room tape for May 27, 1999 because the charge(s) were not based on activity recorded on the tape. He did not review the tape because the video camera pans the visiting room and does not cover any one area the entire time. Activity that occurs in the visiting room is not necessarily recorded by the camera. Stidd based his decision on credibility of the eye witness testimony of Officer Hoover. (Id. ¶ 11).

32.    Prior to the June 2, 1999 misconduct hearing, Stidd cannot recall any personal contact with Riley. Prior to or during the misconduct hearing, he was not aware that Riley was recently transferred to SCI-Huntingdon or that had a prior misconduct for assaulting officer McFadden. (Id. ¶ 12).

33.    Riley appealed the decision of the hearing examiner to the Program Review Committee ("PRC"). In his appeal, Riley requested that the PRC review the tape from the

camera in the visiting room. (See Unsworn Declaration of Launtz ¶ 7).

34. On June 4, 1999, the PRC members, reviewed Misconduct No. A 129076. The PRC determined that the misconduct was not based on the video because this was not an incident caught on the tape; rather, the incident was a personal observation by an officer. Riley's misconduct was reduced from a Class I to a Class II misconduct and cell restriction was dismissed. The PRC upheld the hearing examiner's sixty day visiting room restriction. (Id.¶ 8-10).

36. On July 6, 1999, the Board of Probation and Parole suspended the Board action recorded on March 2, 1999, due to the Riley's May 29, 1999 misconduct. (See Defendants Response to Ward Doc. Prod., Rsp. No. 1).

37. At no time did the defendants engage in any retaliatory or discriminatory actions against Riley for any reasons while he was at SCI-Huntingdon, while incarcerated under the custody, care and control of the DOC, or at any other time. (See Buzminsky Declaration ¶15; Baney Declaration ¶ 15; Frank Declaration ¶ 4; Levy Declaration ¶11; Hoover Declaration ¶ 9; Keller Declaration ¶ 25; Launtz Declaration ¶ 13; Stidd Declaration ¶ 13).

Respectfully submitted,

D. MICHAEL FISHER
Attorney General

By: _____
MARYANNE M. LEWIS
Deputy Attorney General

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief, Litigation Section

Office of Attorney General
15th Flr., Strawberry Sq.
Harrisburg, PA 17120
FAX: (717) 772-4526
Direct Dial: (717) 787-9719
DATE: March 15, 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,

    **Plaintiff**

v.

MARTIN HORN, et al.,

    **Defendants**

: No. 1:00-CV-0485
: (Judge Rambo)

### CERTIFICATE OF SERVICE

I, Maryanne M. Lewis, Deputy Attorney General, hereby certify that on this date I caused to be served the foregoing Defendants' Statement of Material Facts As To Which There Is No Genuine Issue In Dispute, by depositing a copy of the same in the United States mail, postage prepaid, in Harrisburg, PA., addressed to the following:

Ronald A. Riley, #AK-8743
SCI-Huntingdon
Drawer R
1100 Pike St.
Huntingdon, PA  16654-1112

_____
MARYANNE M. LEWIS
DEPUTY ATTORNEY GENERAL

DATE: March 15, 2001