JUDGE'S COPY

Copy
43

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY, AK-8743,
in his own behalf,

              PLAINTIFF:

      -VS-

MARTIN HORN, et al.,

            DEFENDANT'S

:
:
:
:
:
:
:
:
:
:
:
:
:

NO. 1:00-CV-00485
(JUDGE RAMBO)

FILED
HARRISBURG, PA

MAR 2 3 2001

MARY E. D'ANDREA, CLE...
Per _____
Deputy Clerk

PLAINTIFF'S REBUTAL IN OPPOSITION TO DEFEN-
DANT'S SUMMARY JUDGMENT AND STATEMENT OF MAT-
ERIAL FACT'S AS TO WHICH THERE IS NO GENUINE
ISSUE IN DISPUTE

TO THE HONORABLE SYLVIA H. RAMBO, JUDGE:

    Plaintiff RONALD A. RILEY, AK-8743, "pro se", files this

herein Rebutal In Opposition To Defendant's Summary Judge and Stat-

ement of Material Facts as to which there is no genuine issue in

dispute filed March 15, 2001.

    Plaintiff hereby incorporates by reference paragraphs 1 thro-

ugh 59 of his Complaint filed March 14, 2000, page 1 through 16 of

his Rebutal To Defendant's Answer To Complaint filed June 12, 2000,

and page 1 through 5 of his Rebutal To Defendant's Opposition To

Plaintiff's Amended Supplemental Pleading filed January 1, 2001,

as if fully set fourth herein.

1. ADMITTED.

2. ADMITTED.

3. DENIED. (See Plaintiff's Answer in his Rebutal To Defend-
ant's Answer filed June 12, 2000, ¶ 22 ).

4. DENIED. (See Plaintiff's Complaint ¶ 28, and Plaintiff's
Rebutal To Defendant's Answer filed June 12, 2000, Issue One ¶ 2 ).

5. ADMITTED.

6. ADMITTED.

7. DENIED. (See Plaintiff's Response To Supplemental Documents
filed March 8, 2001, ¶ 38 of this Rebutal ).

8. DENIED. (See Plaintiff's Response To Supplemental Documents
filed March 8, 2001, ¶ 38 of this Rebutal ).

9. DENIED. Plaintiff contends that the Pennsylvania Board of
Probation and Parole cannot parole a inmate to a CCC, pursuant to
Title 61 P.S. § 1051-1053 only Department of Correction have that
anthority. (See Exhibit G of Plaintiff's Amended Supplemental Plead-
ing filed December 7, 2000 ).

10. ADMITTED in part and DENIED in part. It is ADMITTED that Donald Williamson, the Diagnostic and Classification Coordinator of the Bureau of Inmate Services, approved and facilitated Plaintiff's transfer to SCI-Huntingdon on May 14, 1999. It is DENIED that Plaintiff no longer have a active separation against him and SCI-Huntingdon. See Plaintiff's Complaint ¶ 28, and Plaintiff's Rebutal To Defendant's Answer filed June 12, 2000, Issue One ¶ 2.

11. DENIED. (See Plaintiff's Complaint ¶ 28, and Plaintiff's Rebutal To Defendant's Answer filed 12, 2000, Issue One ¶ 2 ).

12. DENIED. In Defendant's Memorandum Of Law In Opposition To Plaintiff's Motion To Compel Discovery **Id. at page 9 line 7-21** it states  Ms. Wiedel could not locate any follow up reports/investigations concerning the May 12, 1999 Initial Reception Committee Review Report. In addition, Ms. Widel searched Riley's institutional file, know as the Dc-15, and could not locate any follow up reports or investigation concerning the May 12, 1999 review . Moreover, Defendant's told  Plaintiff that no follow up reports can be located in this very Memorandum. Now, in this Summary Judgment, Defendant's are for the first time mentioning this report. Plaintiff contends that this investigation by Defendant Keller is a fraud designed to persuade this Honorable Court into believing that the reason stated on line 12 of this Summary Judgment is why the Defendant's forced Plaintiff back inside SCI-Huntingdon. (Exhibit A.).

13. DENIED. Defendant Keller at no time during Plaintiff's

entire incarceration at SCI-Huntingdon inform Plaintiff of anything
dealing with why Plaintiff was transferred back to SCI-Huntingdon,
nor did Defendant Keller answer Plaintiff's request slip that he
sent to him. (See Exhibit C in Plaintiff's Complaint ). Additionally,
Plaintiff contends that surely if the Defendant's had proof of this
interview considering the nature of the subject matter, they would
have presented it to this Honorable Court when they filed Answer to
Plaintiff's Complaint.

14. DENIED. (See Plaintiff's Complaint ¶ 28, and Plaintiff's Reb-
utal To Defendant's Answer filed June 12, 2000, Issue One ¶ 2 ).

15. DENIED. Plaintiff followed the rules and regulations of
this institution pertaining to the filing of request slips to staff
members. There is a box at the front of every Block marked request
slip box, that all of the inmates put their request slips in. More-
over, Defendant's said the same thing about the Initial Reception
Committee Review Report, but on the eve of the close of litigation
in this action, they remembered Defendant Keller's investigation.
(See  ¶ 12 of this Rebutal).

16. (See Plaintiff's Response to ¶ 15 above).

17. DENIED. This inmate Tracking System Database was put into
effect January 1, 2001. (See Exhibit B.). Moreover, prior to this
new Tracking System Database the Grievance Coordinator would ignore
some of the Grievances filed to her office. (See page 6 of Plaint-

iff's Rebutal To Defendant's Answer filed June 12, 2000).

18. DENIED. (See Plaintiff's Response to ¶ 17 above).

19. DENIED. (See Plaintiff's Rebutal To Defendant's Answer filed June 12, 2000, page 6 ¶'s 4-6).

20. Plaintiff placed his communication to the Secretary of the Department of Corrections in the inmate mail box at the end of the Block in which he is housed. The only way that inmates can mail anything to the outside is through the institution mail system.

21. (See Plaintiff's response to ¶ 20 above).

22. (See Plaintiff's response to ¶ 21 above).

23. DENIED. (See Plaintiff's Rebutal To Defendant's Answer filed June 12, 2000, Issue Four ¶'s 1-6).

24. ADMITTED.

25. DENIED. Defendant Hoover was a Officer at the time of this alleged assault by Plaintiff and made it clear to Plaintiff that "they should not have brought your ass back here. That is what is wrong with you stupid ass neggers. But I am going to get your ass if that is the last thing that I do". (See Plaintiff's Rebutal To Defendant's Answer filed June 12, 2000). Additionally, Plaintiff

contends that if the Defendant's produce the grievances that he
requested in his discovery against Defendant Hoover it will prove
that said Defendant has retaliated and made this kind of racial sta-
tements before.

26. DENIED. (See Plaintiff's response to ¶ 25 above). By way
of further response, Defendant Hoover not only worked May 23, 1999,
but May 24, 1999, as well.

27. DENIED. (See Plaintiff's Rebutal To Defendant's Answer fil-
ed June 12, 2000, Issue Four page 13-14 ¶'s 1-6). By way of further
response, the purpose of the video cameras in the visiting room is
to record everything in a non biased way. Moreover, regardless of
what the misconduct was based upon the truth is the truth.

28. ADMITTED.

29. DENIED. Pursuant to Department of Corrections Administrat-
ive Directive Manual 801 (c) the hearing examiner reviews the evid-
ence in the case. Additionally, how can the hearing examiner make
a non biased decision without reviewing all of the evidence in the
case ?

30. DENIED. (See Plaintiff's response to ¶ 29 above). Additi-
onally, how can Defendant Stidd (hearing examiner) reach any accur-
ate conclusion without reviewing all of the evidence. It is stand-
ard practice at SCI-Huntingdon for the hearing examiner to take the
word of Staff over inmate. The Defendant's will review the video

tape to convict a inmate but not to acquit. (See Exhibit C ).


31. DENIED. All three (3) video cameras in the inside visit-
ing room are stationary to cover the area in which they are assig-
ned. Where Plaintiff   and his family was setting the camera always
records due to the bathroom being across from Plaintiff. (See Exhi-
bit C. ).

32. (See Plaintiff's Rebutal To Defendant's Answer filed June
12, 2000, Issue Two, page 10 ¶ 3-6).


33. ADMITTED.


34. ADMITTED. By way of further response, see Plaintiff's res-
ponse to ¶'s 27-30 of this rebutal. Moreover, Plaintiff contends
that this incident did not show up on the tape because it did not
happen.

36. ADMITTED.


37. DENIED. (See Plaintiff's Complaint ¶'s 47-59, Plaintiff's
Rebutal To Defendant's Answer filed June 12, 2000, page 8-15, and
Plaintiff's Rebutal To Defendant's Opposition To Plaintiff's Amend-
ed Supplemental Pleading page 3 ¶ 2).


REBUTAL TO SUPPLEMENTAL DOCUMENTS FILED MARCH 8, 2001.


38. On March 8, 2001, Defendant's filed a Supplemental Docum-
ent to this Honorable Court introducing Memorandums dated December

15, 1998, February 17, 1999, and May 4, 1999, pertaining to the
transfer of inmates accepted to Community Corrections Centers who
have acceptance dates thirty and ninety days in advance. (Exhibit D).

Plaintiff contends that the Supplemental Memoradums submitted
by Defendant's are not Department of Corrections Administrative Dir-
ective Manual policy (Hereafter DC-ADM). The policy and procedures
that governing Pre-release Transfer and Community Corrections Cent-
ers is DC-ADM 805 (Policy And Procedures For Obtaining Pre-Release
Transfer). Moreover, Plaintiff points out that not only are these
Supplemental Memoradums absent the official policy statement for-
mat, and the signature of the Commissioner of Corrections (Defenda-
nt Horn) to make them official DC-ADM policy and procedure, but abs-
ent Defendant Horns knowledge of their existence as well; account-
ing for Defendant Horns directing Plaintiff to the governing policy
and procedures pertaining to Pre-Release Transfers and pre-release
programs of any kind. Id. at page 5 line-3. (Exhibit E).

Plaintiff asserts that the defendant's introduced these Supp-
lemental Memorandums seven (7) days before dispositive motions to
persuade the Court into believing that this is the policy and proc-
edures that the Defendant's followed when transferring Plaintiff
back to SCI-Huntingdon. Additionally, Plaintiff points out that
since these Supplemental  Memorandums are not official DC-ADM pol-
icy, and formulated in the official way, as they are standard com-
puter printouts they could have been printed up and faxed to the
Deputy Attorney Generals Office within minutes of them being mailed

to this Honorable Court.

Plaintiff contends that the Defendant's cannot prove that these Supplemental Memorandums were in existence before/during/after the filing of Plaintiff's Complaint. However, Plaintiff can and has proven that they are not policy and procedure in DC-ADM (Inmate Handbook). By way of further response, if these Supplemental Memorandums were in fact in existence according to their dates, why were they not made official DC-ADM policy or amended to DC-ADM 805 which governs the procedures in which they address ? These Supplemental Memorandums do not even sight the rule/policy number in which they derive their authority from to make them applicable in this situation.

For this Honorable Court's convenience Plaintiff has enclosed attached as Exhibit F, six (6) official DC-ADM policy statements to compare to the Supplemental Memorandums filed by Defendant's as the procedure in which they followed in transferring Plaintiff back to SCI-Huntingdon. Moreover, a review of DC-ADM (Inmate Handbook) this Honorable Court will find that all 22 policy and procedure statements contain therein, are in the official policy format as Exhibit F.

Plaintiff respectfully request this Honorable Court to disregard the Supplemental Memorandums because they are not in accord with section 201, 206 and 506 of the Administrative Code of 1929, 71 P.S. §§ 61, 66 and 186, Act of April 9, 1929, P.L. 177, no. 175, as amended granting the Secritary of Corrections (Defendant Horn) the authority to direct the operation of the Department of Correction. Moreover, a review of all 22 of the policy directives in DC-ADM

(Inmate Handbook) have the Secretary of Corrections signature on them, and not the Deputy Secretary.

According to the Supplemental Memorandum dated May 4, 1999, it states "Inmates who are <u>paroled</u> to a CCC and have an acceptance date in **excess of 30 days, who are not problematic cases and have been recommended for parole by institutional steff** should be transferred to the OSU at Graterford for Region 1, the CL2 Unit at Huntingdon for Region 2 and the CL2 Unit at Greene for Region 3." (Exhibit D.).

Pursuant to DC-ADM 805 ¶ **VI. section 6. and subjection 5,** Plaintiff is classified as a **problematic case** and should not have been transferred to the CL2 Unit at SCI-Huntingdon due to Plaintiff having a sex offense. (Exhibit G.).

Plaintiff contends that in their (Defendant's) haste to invent a police and procedure to covence this Honorable Court that they in fact followed established procedures in transferring Plaintiff back to SCI-Huntingdon, the Defendant's forgot to omit the **problematic case** statement in their Seplemental Memorandum dated May 4, 1999. Moreover, this is another fact that substantiates Plaintiff's claim that he should not have been transferred back to this SCI-Huntingdon and proves Defendant's recklessly and with gross negligence and deliberate indifference to Plaintiff's well being, put Plaintiff's Life in danger transferring him back to this Hostile and Life Threatening environment, and giving the Defendant's an opportunity to give Plaintiff retalitory misconducts to prevent his release.

39. Plaintiff contends that when considering a Motion For Summary Judgment the Court is suppose to review the evidence submitted by both sides in the light most favorable to the party opposing the Motion. UNITED STATES v. DIEBOLD, 369 U.S. 654, 655 (1962); ADICKES v. S.H. KRESS & Co., 398 U.S. 144, 157, 160 (1970).


C O N C L U S I O N


**WHEREFORE**, Plaintiff RONALD A. RILEY, AK-8743, "pro se", respectfully request this Honorable Court to dismiss Defendant's Summary Judgment Motion And Statement Of Material Fact as to which there is no genuine issue in dispute, and grant Plaintiff the declaratory judgment and other relief that he requested in his Complaint.



DATED: MARCH 19, 2001


Respectfully Submitted,

RONALD A. RILEY, AK-8743
PLAINTIFF pro se
1100 PIKE STREET
HUNTINGDON, PA 16654

## CERTIFICATE OF SERVICE

This is to certify that on March 19, 2001, a true and correct copy of Plaintiff's Rebutal In Opposition To Defendant's Summary Judgment And Statement Of Material Fact's As To Which There Is No Genuine Issue In Dispute was served First Class Mail, and by placing said in my prison mail box for service upon the following:

OFFICE OF THE ATTORNEY GENERAL
MARYANNE M. LEWIS
15th FLR., STRAWBERRY SQUARE
HARRISBURG, PA 17120

DATED: MARCH 19, 2001

Respectfully Submitted,

RONALD A. RILEY, AK-8743
PLAINTIFF pro se
1100 PIKE STREET
HUNTINGDON, PA 16654

E X H I B I T (A).

other information about inmates and Department staff with whom the subject inmate is to be separated." (Id. at ¶11) Horn further explained that " inmates are transferred from one institution to another for reasons varying from separations, (from other inmates or from staff at one institution), security risks, visitations, accommodations, health reason, or overcrowding.  Regardless of the penological reason for transferring an inmate, it is not information that is freely available to inmates." (Id. at ¶13) Simply put, this information should not be released.

In Request 9, plaintiff seeks "a copy of any and all follow up report/investigations by Superintendent Frank, Deputy Superintendent Myers, Major Grace, Intelligence Captain Levy, Unit Manager Launtz and Keller in regards to the Initial Reception Review Report on May 12, 1999. Defendants responded to plaintiff that "no documents can be located."  In his motion to compel, Riley argues that these documents exist because he "posed a serious enough security concern that he was kept in the hole for five months, transferred and a Active Separation placed on him and said institution." (See Pl. Mem. In Sup., pg. 7)  Defendants now provide a declaration from Heather Haldeman Weidel, plaintiff's counselor at SCI-Huntingdon, who reviewed Riley's prison treatment file, known as DC-14, for these documents. If any reports or investigations were initiated after the May 12, 1999 review, they would be in Riley's DC-14.  Ms. Weidel could not locate any follow up reports/investigations concerning the May 12, 1999 Initial Reception Committee Review Report. In addition, Ms. Weidel searched Riley's institutional file, known as the DC-15,  and could not locate  any follow up reports or investigation concerning the May 12, 1999 review. (See Declaration of Weidel, ¶¶5-6,  attached as Exhibit "B")  While plaintiff may believe that an investigation or report exists following the committee's review,  none can be located.

E X H I B I T (B).



**POLICY STATEMENT**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
|---|---|
| **Inmate Grievance System** | **DC-ADM 804** |

| Date of Issue | Authority: | Effective Date |
|---|---|---|
| **December 1, 2000** | *(signature)* Martin F. Horn | **January 1, 2001** |

**Martin F. Horn**

## I.   AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206 and 506 of the Administrative Code of 1929, 71 P.S. §§61, 66 and 186, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   PURPOSE

It is the purpose of this policy to establish procedures for the review of inmate grievances. These procedures ensure that inmates have an avenue through which resolution of specific problems can be sought.

## III.   APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV.   DEFINITIONS

### A.  Automated Inmate Grievance Tracking System

A computerized system maintained by the Secretary's Office of Inmate Grievances and Appeals designed to store and retrieve data and trends pertaining to the Inmate Grievance System.

### K. Grievance Restriction

Inmates who deliberately misuse the grievance system by filing frivolous or fabricated grievances may be restricted to filing no more than one grievance each five (5) working days.

### L. Initial Review

A review of an inmate's initial grievance conducted by a Grievance Officer. The Facility Manager may direct the Facility Grievance Coordinator to review certain grievances.

### M. Retaliation

An act of vengeance or threat of action taken against an inmate or staff in response to an inmate complaint of a problem. Examples include unnecessary discipline, intimidation, unnecessary changes in work or program assignments, unjustified transfers or placements, unjustified denials of privileges and services.

### N. Secretary's Office of Inmate Grievances and Appeals

The office responsible for review and disposition of all appeals of inmate grievances to Central Office.

### O. Working Days

For the purposes of this policy, working days are Monday through Friday, excluding state holidays.

## V.  POLICY

It is the policy of the Department that every individual committed to its custody shall have access to a formal procedure through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. For every such issue, there shall be a forum for review and one (1) avenue of appeal. The formal procedure shall be known as the Inmate Grievance System.[1]

## VI.  PROCEDURES

### A. Initial Grievance

1. Inmate Responsibilities

   a. The Department encourages inmates to express their concerns to staff through respectful, constructive, verbal communication in order that problems are resolved as soon as possible.

---

[1] 3-4271, 3-ACRS-3D-07, 1-ABC-3D-08, 2-CO-3C-01

k.  At any point in the grievance process, the inmate may withdraw the grievance. To withdraw a grievance, an inmate may write on the original grievance "I wish to withdraw this grievance," sign and date the original grievance form or submit a request form to the Facility Grievance Coordinator, identifying the grievance, by number, to be withdrawn.

l.  If a grievance is rejected, when resubmitted, the grievance must be resubmitted under the same grievance number.

## B. Initial Review

1.  Staff Responsibilities

    a.  The Facility Grievance Coordinator shall assign a grievance tracking number to all grievances (even rejected grievances) upon receipt and enter all grievances into the Automated Inmate Grievance Tracking System. The Facility Grievance Coordinator is also responsible for entering the facility's disposition of the grievance at each step of the grievance process.

    b.  The Facility Grievance Coordinator may combine multiple grievances that relate to the same subject.

    c.  The Facility Grievance Coordinator, based on the Grievant's situation, may grant an extension of time for filing the grievance.

    d.  If the grievance is determined to be improperly submitted, it shall be returned to the Grievant unprocessed with a **DC-804 Part 3, Grievance Rejection Form** enumerating the reason(s) the grievance was not accepted. **(See Attachment C)** The grievance, if resubmitted, must be resubmitted under the same grievance number within five (5) working days.

    e.  If the Facility Grievance Coordinator determines that the issue being grieved is in accordance with **DC-ADM 804**, it will be referred to an appropriate Grievance Officer for review.

    f.  The Grievance Officer may submit the grievance for formal resolution or meet with the inmate to suggest ways in which the grievance can be resolved. The Grievance Officer may grant the inmate a maximum of five working days to resolve the grievance informally.

    g.  If the Grievance Officer submits the grievance for formal resolution, within ten (10) working days of receipt of the grievance, the Grievance Officer shall provide a written response to the Grievant, using a **DC-804 Part 2 (See Attachment B)** and include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the incident raised in the grievance. A copy of the response shall be sent to the Facility Grievance Coordinator for tracking purposes.

    d.  When the Facility Manger remands a grievance, the Grievance Officer shall respond within five (5) working days.

## D.  Appeal to Secretary's Office of Inmate Grievances and Appeals

1.  Inmate Responsibilities

    a.  The decision from appeal to the Facility Manager must be received by the inmate before an appeal to the Secretary's Office of Inmate Grievances and Appeals can be sought.

    b.  Any Grievant, who is dissatisfied with the disposition of an appeal from the Facility Manager, may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals, within five (5) working days of receiving the decision. An allowance shall be made for delays with mail delivery.  Only issues raised at the Initial Review and appeal to the Facility Manager may be appealed at this level.

    c.  An appeal at this level will not be permitted until the Grievant has complied with all procedures established for Initial Review and Appeal to Facility Manager.

    d.  The text of the appeal shall be legible, presented in a courteous manner, and the statement of facts shall not exceed two (2) pages.

    e.  All appeals to the Secretary's Office of Inmate Grievances and Appeals must be addressed to the following:

> **Chief, Secretary's Office of Inmate Grievances and Appeals**
> **Department of Corrections**
> **2520 Lisburn Road, P. O. Box 598**
> **Camp Hill, PA  17001-0598**

        Failure to properly address the appeal will delay the process.

    f.  Inmates appealing to final review are responsible for providing the Secretary's Office of Inmate Grievances and Appeals with all available paperwork relevant to the appeal.  A proper appeal to final review should include photocopies of the initial grievance, Initial Review, and the Appeal to Facility Manager along with the Facility Manager's decision.

    g.  Indigent inmates as defined in Department policy **DC-ADM 803, "Inmate Mail and Incoming Publications,"** shall be afforded copy service at no charge in order to submit the required documentation for appeal purposes.  Non-indigent inmates shall incur copying charges in accordance with Department policy **3.4.5, "Photocopying Charges for Inmates."**

      j.  Any inmate, who is transferred after filing a grievance or an appeal, but prior to completing the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager of the facility in which confined when the grievance was filed. Adjustments shall be made to the various time limitations in order to facilitate review.

### E. Grievance Restriction

1. The Facility Grievance Coordinator will provide the inmate with written notice of the restriction and the reason(s) for it. The Facility Manager shall approve the restriction and a copy of the notice will be forwarded to the Secretary's Office of Inmate Grievances and Appeals.

2. Inmates who deliberately misuse the grievance system by filing frivolous or fabricated grievances may be restricted to filing no more than one grievance each five (5) working days.

3. Upon request of the inmate, the Facility Manager may review the restriction every ninety (90) working days and shall provide notice to the inmate and the Chief, Secretary's Office of Inmate Grievances and Appeals, of the determination to continue or discontinue the restriction and the rationale for the determination.

4. If the inmate continues to abuse the grievance system, the Facility Manager may request a longer period of restriction between grievances through their Regional Deputy Secretary. A copy of the request shall be forwarded to the Secretary's Office of Inmates Grievances and Appeals for tracking purposes.

5. Any grievance restriction may be appealed to the Secretary's Office of Inmate Grievances and Appeals. Appeals must comply with **Section D, 1** above.

### F. Exceptions

1. Initial Review of issues relating to the following <u>Department policies</u> shall be in accordance with procedures outlined therein, and <u>will not be reviewed</u> by a Facility Grievance Coordinator.

    a.  **DC-ADM 801, Inmate Discipline;**

    b.  **DC-ADM 802, Administrative Custody Procedures**; and

    c.  any other Department policy that specifically states that the **DC-ADM 804** is not applicable.

## VII. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary, or designee may suspend any provision or section of this policy, for a specific period.

      b.  DC-ADM 804-1 issued April 2, 1996 by Secretary Martin F. Horn.

      c.  DC-ADM 804-2 issued October 21, 1997 by Secretary Martin F. Horn.

      d.  DC-ADM 804-3 issued October 21, 1997 by Secretary Martin F. Horn.

      e.  DC-ADM 804-4 issued April 29, 1998 by Secretary Martin F. Horn.

      f.  DC-ADM 804-5 issued October 30, 2000 by Secretary Martin F. Horn.

  **2.  Facility Policy and Procedures**

    This document supersedes all facility policy and procedures on this subject.

**B.  Cross Reference(s)**

  1.  Administrative Manuals

      a.  DC-ADM 801, Inmate Discipline

      b.  DC-ADM 802, Administrative Custody Procedures

      c.  DC-ADM 803, Inmate Mail and Incoming Publications

      d.  1.2.4, Inmate Abuse Allegation Monitoring Process

      e.  3.4.5, Photocopying Charges for Inmates

  2.  ACA Standards

      a.  Administration of Correctional Agencies: 2-CO-3C-01

      b.  Adult Correctional Institutions: 3-4271

      c.  Adult Community Residential Services: 3-ACRS-3D-07

      d.  Adult Correctional Boot Camp Programs: 1-ABC-3D-08

      e.  Correctional Training Academies: None

*DC-ADM 804, Inmate Grievance System*                                    ***Attachment B***

DC-804
Part 2

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P.O. BOX 598
CAMP HILL, PA 17001

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO.

| TO: (Inmate Name & DC No.) | FACILITY | HOUSING LOCATION | GRIEVANCE DATE |
|---|---|---|---|
| | | | |

The following is a summary of my findings regarding your grievance:

| Print Name and Title of Grievance Officer | SIGNATURE OF GRIEVANCE OFFICER | DATE |
|---|---|---|
| | | |

**E X H I B I T (C).**

<u>A  F  I  D  A  V  I  T</u>

I, ARMENIOUS ALSTON, AY-8284, hereby certify pursuant to
28 U.S.C. §1746, subject to the penalties of perjury under the laws
of the United States of America that the statements set forth below
are true and correct to the best of my belief, understanding, reco-
llections and infromation.

1. I am presently incarcerated at SCI-Huntingdon, of which I
have been for more then ten (10) years.

2. On or about April 19, 1998, at 9:00 AM I received a visit
from a female friend.

3. On or about April 20, 1999, I received a Class (1) miscon-
duct from Correctional Officer Wilson stating that as she was rev-
iewing the video tape from the visit's the previous day (April 19,
1998) she observed me coming out of the visitor's bathroom.

4. At the hearing held in this matter the video tape from cam-
era (1) by the visitor's bathroom was played by the hearing examiner
and I was found guilty of the Class (1) misconduct issued by Officer
Wilson.

I, declare under penalty of perjury that the foregoing is true
and correct. Executed at SCI-Huntingdon 1100 PIKE STREET HUNTINGDON,
PENNSYLVANIA 16654.

DATED: <u>June 25,</u> 2000

Respectfully Submitted,

ARMENIOUS ALSTON, AY-8284

**E X H I B I T (D).**

COMMONWEALTH OF PENNSYLVANIA
**Department of Corrections**
**Deputy Secretary's Office**
**May 4, 1999**

**SUBJECT:**   Transfer of **Parole** Inmates Accepted for CCC's to Graterford, Huntingdon, and Greene

**TO:**   Superintendents

**FROM:**   Jeffrey A. Beard, Ph.D.
Executive Deputy Secretary

Effective immediately, there will be a change to the procedure for the processing of CCC accepted inmates who are being paroled to a CCC.

Inmates who are paroled to a CCC and have an acceptance date in **excess of 30 days, who are not problematic cases and have been recommended for parole by institutional staff** should be transferred to the OSU at Graterford for Region I, the CL2 Unit at Huntingdon for Region II and the CL2 Unit at Greene for Region III.

Cases which are currently awaiting transfer with an acceptance date beyond 30 days for pre-release and parole placement should be processed for immediate transfer to these units.

Questions should be directed to your Regional Deputy.

JAB/jb

cc:   Secretary Horn
Deputy Secretary Love
Deputy Secretary Fulcomer
Deputy Secretary Erhard
Director Rogosky
Director Harrison
D. Gearhart
D. Williamson
CCC Regional Directors

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
Bureau of Inmate Services
(717) 737-6538
February 17, 1999

SUBJECT:   Transfer of Inmates Accepted for CCC's

TO:          Superintendents

FROM:       Donald Williamson
             Coordinator
             Diagnostic & Classification

As you know, Executive Deputy Beard established a new procedure for the processing of pre-release inmates who have CCC bed dates in excess of 30 days and for the processing of CCC accepted inmates in excess of 90 days, who are being paroled to a CCC.

At the present, inmates accepted into Centers in Region I are to be sent to the Outside Service Unit at Graterford. Those accepted into Centers of Region II and III are to be sent to the CL-2 Unit at SCI- Greene.

Effective February 22, 1999 we are now adding the CL-2 Unit at SCI-Huntingdon to start accepting Region 2 CCC acceptees. Region I cases should continue to go to SCI-Graterford and Region III cases should go to SCI-Greene.

As these units are eventually filled, arrangements may be made for placement at alternative regional CL-2 Unit placements and waiting lists will be established.

Thank you for your continued cooperation.

DW/jk

cc:   All Deputies
       Director Harrison
       Chief Gearhart
       Rex Hildebrand
       Robin Rutter
       Richard Wigton
       Tanya Brandt

RECEIVED

FEB 2 2 1999

SCI-HUNTINGDON

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
December 15, 1998

**SUBJECT:**  Transfer of Inmates Accepted for CCC's to Greene and Graterford

**TO:**  Superintendents

**FROM:**  Jeffrey A. Beard, Ph.D.
Executive Deputy Secretary

Effective immediately, there will be a new procedure for the processing of pre-release inmates who have CCC bed dates in excess of 30 days and for the processing of CCC accepted inmates who are being paroled to a CCC.

Pre-release inmates who are approved for a Community Corrections Center for an acceptance date beyond 30 days will either be sent to Graterford for placement in the Outside Service Unit or to Greene in the L-2 Unit.  Male inmates accepted into centers in Regions II and III will be processed for transfer to the L-2 Unit at SCI Greene and those accepted into a Region I facility will be processed for transfer to the Outside Service Unit at Graterford.  They will remain in these locations until they reach their acceptance date into the center.

Inmates who are being paroled to a CCC and have an acceptance date in excess of 90 days, who are not problematic cases and have been recommended for parole by institutional staff should similarly be transferred to SCI Greene and SCI Graterford as indicated above.

Should inmates fail in Community Corrections, they will be returned to their parent facility where they resided prior to transfer to Graterford or Greene.  If they were accepted as a result of a direct referral from Greene or Graterford, then they will return to the referring facility.

Acceptance letters will be modified to alert staff to process the inmates through the Automated Transfer Petition System for the appropriate transfers (samples attached).  Cases which are currently awaiting transfer with an acceptance date beyond 30 days for pre-release and 90 days for parole placement should be processed for immediate placement into the units.

Any questions should be directed to your Regional Deputy Secretary.

JAB/jb
Attachments

cc:    Secretary Horn
       Deputy Secretary Erhard
       Deputy Secretary Fulcomer
       Deputy Secretary Love
       Director Rogosky
       Director Harrison
       D. Gearhart
       D. Williamson

E X H I B I T (E).

routine bases [sic] Counselor's, Unit Manager's, and other Department of Corrections staff classify prisoners as problematic or non- problematic cases who do not qualify for pre-release because they are past their minimum sentence." (See Pl. Mem.in Supp., pg.3) Defendant Horn responded to these interrogatories by directing plaintiff to the DC-ADM 805, found in the Inmate Handbook, which contains the policy and procedures for obtaining pre-release transfer, which includes potential problematic cases. (See Horn's Response, ¶¶6-13) As noted in Horn's declaration, information concerning the policies and regulations regarding pre-release and problematic cases is found in the inmate handbook and does not contain information that would jeopardize the security of the institution. (See Horn Declaration, ¶9). Plaintiff fails to mention whether he reviewed any of the information contained in the Inmate Handbook.

Finally, plaintiff seeks to compel defendant Horn to respond to Interrogatories Nos.18 - 21, which seeks information concerning the transfer or termination of defendants Frank, Myers, Launtz and McFadden. In his memorandum, Riley argues that "he is entitled to this information because he alleges in his complaint that defendants recklessly and with gross negligence and deliberate indifference to Plaintiff's well being, put Plaintiff's Life in Danger by excepting him back into SCI-Huntingdon, and (2) if said Defendant's was demoted, transferred or forced to retire due to negligent behavior, that relates to a critical contention made by Plaintiff in his complaint." (See Mem. in Sup., pgs. 3-4) Defendant Horn objected to these interrogatories as overbroad and irrelevant to plaintiff's complaint and unlikely to lead to admissible evidence. Horn further responded that defendant Myers and Launtz were not terminated, rather retired from their employment at SCI-Huntingdon. (See Horn's Resp., ¶¶ 18-19) The personal reasons why these defendants chose to retire from their employment has no bearing on the allegations contained in this complaint.

-5-

E X H I B I T (F).



| | |
|---|---|
| **POLICY STATEMENT** | |
| **Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | | Policy Number: |
|---|---|---|
| **News Media Relations** | | **DC-ADM 009** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **January 4, 2001** | *Martin F. Horn* **Martin F. Horn** | **February 4, 2001** |

## I.    AUTHORITY

The authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, and 506 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, 71 P.S. § 61, 66, and 186 as amended.

## II.    PURPOSE

It is the purpose of this policy to establish procedural guidelines for conducting news media relations.[1]

## III.    APPLICABILITY

This policy is applicable to all persons who are incarcerated in, contracted by, or employed by the Department of Corrections and news media representatives having contact with the Department.

## IV.    DEFINITIONS

### A. Department

The Department of Corrections.

### B. Facility Manager

The Superintendent of a State Correctional Institution, State Regional Correctional Facility, Director of a Community Corrections Center, Commander of a Motivational Boot Camp, or Director of the Training Academy.

---

[1] 3-4022, 1-ABC-1A-19



| | POLICY STATEMENT<br>Commonwealth of Pennsylvania • Department of Corrections |

| Policy Subject: | Policy Number: |
|---|---|
| Inmate Mail and Incoming Publications | DC-ADM 803 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| January 22, 2001 | *Martin F. Horn*<br>Martin F. Horn | February 19, 2001 |

## I.   AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   PURPOSE

It is the purpose of the Department of Corrections to establish policy and procedures that govern inmate mail privileges and incoming publications. [1]

## III.   APPLICABILITY

This policy applies to all inmates and employees, volunteers, and contract vendors who reside or work in facilities under the jurisdiction of the Department with the exception of the Bureau of Community Corrections.

## IV.   DEFINITIONS

### A. Approved Inmate Name

The committed name and/or a name change that is in accordance with Department policy, **11.5.1, "Records Office Operations."**

---

[1] 1-ABC-5D-01; 1-ABC-5D-04; 2-CO-5D-01



| | |
|---|---|
| **POLICY STATEMENT**<br>**Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | Policy Number: |
|---|---|
| **Inmate Visiting Privileges** | **DC-ADM 812** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **April 19, 2000** | *Martin F. Horn*<br>**Martin F. Horn** | **May 24, 2000** |

## I.   AUTHORITY

The Authority of the Secretary of Corrections to direct the operations of the Department of Corrections is established by Sections 201, 206, 506, and 901.B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   PURPOSE

It is the purpose of this policy to encourage opportunity for visits with family members, relatives, and friends. This is important to morale, sustaining family life and insuring ties in the community after release.

## III.   APPLICABILITY

This policy is applicable to all facilities under the jurisdiction of the Department of Corrections that provide for inmate visits.

## IV.   DEFINITIONS:

### A. Attorney

Any person admitted to the Bar of any State or Federal court.



| POLICY STATEMENT | |
| --- | --- |
| **Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | Policy Number: |
| --- | --- |
| **Searches of Inmates and Cells** | **DC-ADM 203** |

| Date of Issue: | Authority: | Effective Date: |
| --- | --- | --- |
| **June 9, 2000** | *[signature]* **Martin F. Horn** | **July 10, 2000** |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

It is the purpose of this policy to provide for searches of facilities and inmates to control contraband and provide for its disposition.[1]

## III. APPLICABILITY

This policy is applicable to all facilities, and inmates under the jurisdiction of the Department of Corrections.

## IV. DEFINITIONS

### A. Annual Search Plan

A plan developed to ensure that all areas other than inmate living quarters are searched a minimum of three (3) times a year.

### B. Body Cavity Searches

A body cavity search is a physical examination of an inmate's anal and/or genital cavity. Only a physician conducts this procedure.

---

[1] 3-4184



| BULLETIN |
| --- |
| Commonwealth of Pennsylvania • Department of Corrections |

| TO: | Policy Subject: |
| --- | --- |
| **Executive Staff**<br>**Superintendents**<br>**Boot Camp Commander**<br>**Regional Directors** | **Access to Provided Legal Services** |
|  | Policy Number: DC-ADM 007-1 |
|  | Policy Issue Date: May 10, 1999 |

| Date of Issue: | Authority: | Effective Date: |
| --- | --- | --- |
| August 28, 2000 | *[signature]*<br>**Martin F. Horn** | September 28, 2000 |

The purpose of this bulletin is to reissue Attachment B, "Legal Reference Materials Mini-Law Library" of this policy. The new attachment includes "Leibman on Habeas Corpus" procedures.

Attachment (DC-ADM 007, Attachment B, "Legal Reference Materials Mini-Law Library"

E X H I B I T (G).

DC-ADM 805

1.  Inmates who have been sentenced to death or life imprisonment are not eligible.

2.  Time-served requirements are as follows:

    i.  To be time-eligible for placement in a Community Corrections Center or Contract Facility, the inmate must have completed at least one-half (1/2) of his/her minimum sentence, be within one year of completing his/her minimum sentence, have no outstanding detainers, and have served at least 9 months in a state institution.

    Exceptions may be made with written approval of the Regional Deputy Commissioner when early transfer is necessary to assist in the inmate's access to medical or mental health care or to provide longer period of participation for an inmate who has been confined for an unusually long period of time. No contact shall be made with the court until such approval is obtained.

    ii.  For all other pre-release programs, the inmate is time-eligible after he/she has completed one-half (1/2) of his/her minimum sentence or one-half (1/2) of the period ending with anticipated release date of an indeterminate sentence and has served at least 9 months in a state institution. The inmate must have no detainers lodged against him/her for an untried offense or for a sentence with a maximum term equal to or in excess of two years. [For purpose of definition, the Department takes the position that such detainers as fines and costs, non-support, motor vehicle violations, contempt of court, etc. do not fall into the category of "an untried offense" and therefore, while they do remain as detainers, they do not preclude the inmate's participation in pre-release programming. When referring such a case to Community Corrections, CCC staff shall be advised of the nature of the detainers in order that they may take steps to require payment of court costs, fines, restitution and support as a mandatory stipulation of participation in the community corrections program.] Inmates who are otherwise time-eligible who have detainers [other than those described in brackets above] lodged against them for less than two years can be time-eligible for any pre-release program except Community Corrections Center or Contract Facility upon written approval of the Regional Deputy Commissioner of Corrections. No contact shall be made with the court until such approval is obtained.

3.  The inmate must have a favorable recommendation of the majority of correctional facility staff. (Appropriate staff such as the Counselor, Drug & Alcohol Treatment Specialist, Work Supervisor, Housing Officer, Unit Manager, Education/Vocational Supervisor and Inmate Program Manager will vote on the proposed action. The recommendations of these staff will be forwarded to the Deputy Superintendents who will make their recommendations to the Superintendent.)

4.  The inmate must have had no Class I misconducts and no more than one Class II misconduct during the nine (9) months prior to application, and have sustained no Class I misconducts and no more than one Class II misconduct from the time of application to the time of transfer.

5.  Custody Level 4 and 5 inmates are ineligible.

6.  If the inmate's case meets the definition of "Potential Problematic Pre-Release Case", he/she must be processed as follows: