# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                  :
                                  :
          Plaintiff               :
                                  :
     v.                           :     No. 1:00-CV-0485
                                  :     (Judge Rambo)
MARTIN HORN, et al.,              :
                                  :
          Defendants              :

**FILED**
HARRISBURG, PA

MAR 2 9 2001

MARY E. D'ANDREA, CLE[RK]
Per _____ Deputy Clerk

## DOCUMENTS IN SUPPORT OF DEFENDANTS
## MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

**D. MICHAEL FISHER**
Attorney General

**MARYANNE M. LEWIS**
Deputy Attorney General

**SUSAN J. FORNEY**
Chief Deputy Attorney General
Chief, Litigation Section

Office of Attorney General
15th Flr., Strawberry Sq.
Harrisburg, PA 17120
FAX: (717) 772-4526
Direct Dial: (717) 787-9719
DATE: March 29, 2001

# TABLE OF CONTENTS

UNSWORN DECLARATION OF DIANA G. BANEY

UNSWORN DECLARATION OF DENNIS BUZMINSKY

UNSWORN DECLARATION OF DEBRA DELL

UNSWORN DECLARATION OF STEPHEN DOUGHERTY

UNSWORN DECLARATION OF FREDERICK K. FRANK

UNSWORN DECLARATION OF SERGEANT DENNIS HOOVER

UNSWORN DECLARATION OF JOEL KELLER

UNSWORN DECLARATION OF TIMOTHY LAUNTZ

UNSWORN DECLARATION OF CAPTAIN GILBERT LEVY

UNSWORN DECLARATION OF JOSEPH STIDD

UNSWORN DECLARATION OF DONALD WILLIAMSON

Rauser v. Horn,
       2001 WL 18520 (February 26, 2001)

Deposition Transcript of Ronald A. Riley

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                              :
                                             :
      **Plaintiff**                         :
                                             :
      v.                                   :     **No. 1:00-CV-0485**
                                             :     **(Judge Rambo)**
MARTIN HORN, et al.,                          :
                                             :
      **Defendants**                       :

## UNSWORN DECLARATION OF DIANA G. BANEY

I, **DIANA G. BANEY**, hereby declare under the penalty of perjury, that the following is true and correct, based upon my personal knowledge.

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") as the Assistant to the Superintendent at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon"). I have been employed at SCI-Huntingdon since September, 1981.

2.    I have been employed in the capacity of Assistant to the Superintendent at SCI-Huntingdon since January, 1993. In that capacity, I am familiar with the standard operating policies and procedures followed at SCI-Huntingdon and the DOC. I am also familiar with and have access to all records maintained by the institution in the course of regularly conducted business. As Assistant to the Superintendent, I serve as the Grievance Coordinator at SCI-Huntingdon.

3.    As Grievance Coordinator I am responsible for maintaining records of all grievances filed by inmates at SCI-Huntingdon. These records are maintained manually as well as in the Inmate

Grievance Tracking Systems database. I have maintained a computer based Inmate Grievance Tracking System at SCI-Huntingdon since January, 1993.

4. In accordance with DOC Administrative Directive 804 ("DOC-ADM 804"), the Consolidated Inmate Grievance Systems outlines the policies and procedures followed with respect to inmate grievances. This policy is found in the Inmate Handbook issued to all inmates.

5. Inmate grievances are written on an Official Inmate Grievance form, which is available to all inmates. Upon receipt of an Official Inmate Grievance, I review the grievance in order to make an appropriate assignment to a grievance officer for written response. It is routine practice for the grievance officer to respond to the grievance in writing, make a copy of the grievance and response and place a copy of both the grievance and the response in the inmates institutional file. In addition, the grievance is recorded on the Inmate Grievance Tracking System.

6. In May of 1999, I would routinely respond to the grievance in one of two ways. If an inmate's grievance did not meet the standard criteria as outlined in DOC-ADM 804, I would return the grievance to the inmate without assigning a grievance number to the form. I would, however, respond to the inmate on a separate form informing him why the grievance was deficient and what was needed in order for the grievance to meet DOC-ADM 804 standards. I would attach this form to the grievance and return it to the inmate. I would also copy the grievance and my informal response and place them in the inmate's institutional file.

7. If an inmate's grievance met the criteria as outlined by DOC-ADM 804, I would assign the grievance a number in the space provided on the form and review the grievance in order to make an appropriate assignment for investigation. I would then record the grievance number, the

-2-

date of the grievance and the subject of the grievance on the handwritten item log. My secretary would input this same information into the Inmate Grievance Tracking System database.

8.     As outlined by DOC-ADM 804, the grievance officer would then respond in writing to the inmate within 10 working days informing him of the action taken concerning the grievance. In addition, copies of the grievance and response would be placed it in the inmate's institutional file.

9.     As a named defendant in this civil action I received a copy of the complaint and the attached exhibits. Attached as **Exhibits "D" and "F"** to the complaint are Official Inmate Grievance, dated May 23, 1999 and May 29, 1999. I have no record of receiving these grievances. In addition, I personally reviewed Ronald Riley, #AK-8743 institutional file and cannot find any copies of these grievances. Neither my response or the grievances are in his institutional file. If these grievances had been assigned numbers they would have been recorded on the Inmate Grievance Tracking System. These grievances do not appear on the Inmate Grievance System Tracking System's database. Furthermore, there is no record in the computer or his DC-15, institutional record of these grievances being rejected for any reason and returned unprocessed. It is highly unusual that I cannot locate the grievance or my response, as my practice for the past eight years has been to maintain a record of each grievance submitted.

10.     As Assistant to the Superintendent, it is my assigned duty and responsibility to maintain a record of an inmate's request to the Superintendent. In May, 1999, I was the Assistant to Superintendent Frederick K. Frank. If an Inmate Request to Staff Member form was submitted to the Superintendent, I was responsible for tracking the request.

11.    I followed a similar procedure for Inmate Request forms as Inmate Grievance forms.. If I received an Inmate Request form directed to the Superintendent, I would make a copy of the request form and the Superintendent's response and place it in the inmate's institutional file.

12.    I am aware that attached as **Exhibit "D"** of Riley's complaint is an Inmate Request to Staff Members form dated May 12, 1999. I personally reviewed Ronald Riley's, #AK-8743 institutional file and cannot find any copies or record of this request in Riley's file.

13.    If Ronald Riley submitted an Official Inmate Grievance form to me I would have responded to the grievance in one of the ways mentioned in ¶¶6-8, and a copy would have been placed in his institutional file. Likewise, if Riley would have submitted an Inmate Request to the Superintendent I would have placed a copy in his institutional file.

15.    At no time did I engage in any discriminatory or retaliatory conduct concerning Riley while he was incarcerated at SCI-Huntingdon.

03/26/2001  13:06    814-949-7922
MAR-26-01 MON 09:46    ●RNEY GENERAL

SCI HUNTINGDON
FAX NO. 717 ●4526

PAGE  03
P. 06/12

3-26-01
**DATE**

DIANA G. BANEY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                            :
                                            :
        Plaintiff                       :
                                            :
    v.                                      :    No. 1:00-CV-0485
                                            :    (Judge Rambo)
MARTIN HORN, et al.,                        :
                                            :
        Defendants                      :


## UNSWORN DECLARATION OF DENNIS BUZMINSKY

I, DENNIS BUZMINSKY, hereby state under the penalty of perjury, that the following is true and correct based upon on personal knowledge.

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a correctional officer at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon"). I have been employed by the DOC for approximately six years.

2.    I received a Bachelor's Degree in Human Services from Geneva College in 1999.

3.    In May of 1999, I was employed as a Counselor at SCI-Huntingdon. Subsequent to Ronald Riley's transfer to SCI-Huntingdon, I was assigned as his counselor.

4.    Shortly after his transfer to SCI-Huntingdon, Riley was interviewed by the institution's Initial Reception Committee ("IRC"). As Riley's assigned counsel I was a part of and present at his IRC review. The purpose of an IRC review or meeting is to screen inmates for housing needs, medical clearance, placement needs and to gather information from the inmate. A brief accessment is made by the IRC concerning the inmate's place at the institution.

5.   At the IRC, Riley was assigned a classification level 2, and received clearance for placement in general population. His release date to a Community Correction Center was also noted of November 22, 1999. During the IRC, I noted to the Committee that Riley's file contained a staff separation. The purpose of the separation was to protect officer McFadden from any further contact initiated by Riley. The separation was not issued for Riley's protection from any staff inmates or staff.

6.   At the IRC, it was explained to Riley that there would be no problem concerning his placement at SCI-Huntingdon and his separation from McFadden. It was further explained to Riley that McFadden had been on long term disability leave and was not working at the institution.

7.   Subsequent to the IRC meeting I spoke with Riley and once again informed him that his placement at SCI-Huntingdon was proper, as he had no active institutional separations.

8.   As a named defendant in this civil action, I received a copy of the complaint and the attached exhibits. Attached as Exhibits "D" are two Inmate Request to Staff Member forms dated May 23, 1999 and May 29, 1999. Both of the forms are addressed to me. I have no personal recollection of receiving either of these requests.

9.   If I had, in fact, received such a written request, I would have responded in writing to Riley. In addition, any request that I may have received from him would have been placed in his institutional file the DC-15, or his institutional treatment file, the DC-14.

10.   I personally reviewed filings DC-14 and DC-15 and cannot locate Riley's Inmate Request to Staff Member directed to me dated May 23, 1999, May 29, 1999 or any other date in May, 1999. In addition, I cannot locate any written response to those requests.

11.    I was not involved in the issuance of Misconduct No. A129076 charging Riley with Engaging on Sexual Acts With Others or Sodomy and Unacceptable Personal Contact.

12.    I am also aware that SCI-Huntingdon routinely houses inmates paroled to Community Corrections Centers within the DOC Region II who have a parole date in the excess of thirty days or more from the Pennsylvania Board of Probation and Parole action.

13.    I was aware that because Riley had a parole date to a Community Corrections Center in the excess of 30 days from the Parole Board's action date and because he had no valid separations at SCI-Huntingdon he was housed at this institution.

14.    As Riley's counselor, I was aware that due to the misconduct issued to him in May of 1999, the Parole Board rescinded the Board's action recorded February 12, 1999 paroling Riley to a Community Corrections Center.

15.    At no time did I engage in any retaliatory or discriminatory actions against Riley for any reasons while I was his assigned counselor, while he was incarcerated at SCI-Huntingdon or at any other time.

03/15/2001  14:19    814-949-7922                    SCI HUNTINGDON                    PAGE  02
    03/15/2001  10:40    71   05-7240                    OAG LITIGATION                    PAGE  05

DENNIS BUZMINSKY

DATE: _3/15/01_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                         :
                                         :
          Plaintiff                      :
                                         :
     v.                                  :          No. 1:00-CV-0485
                                         :          (Judge Rambo)
MARTIN HORN, et al.,                     :
                                         :
          Defendants                     :


## UNSWORN DECLARATION OF DEBRA DELL

I, **DEBRA DELL**, hereby declare under the penalty of perjury, that the following is true and correct, based upon my personal knowledge.

1.     I am currently employed by the Pennsylvania Department of Corrections ("DOC") as the Executive Secretary to the Secretary of the DOC. I have been employed by the DOC for approximately thirteen years and in the Secretary's office since 1998.

2.     As Executive Secretary to the Secretary of the DOC, I am familiar with the standard operating policies and procedures followed in recording the correspondence directed to the Secretary or this office from inmates. These records are maintained manually as well as in the Inmate Tracking System database. I am also familiar with and have access to all tracking records maintained by this office in the course of regularly conducted business.

3.     Correspondence from an inmate to the Secretary of the DOC is tracked or recorded through an Inmate Tracking System which tracks all correspondence that is received from an inmate directed to the Secretary. In addition to the Inmate Tracking System, the Secretary's office tracks

any documents that are directed to the Secretary or his office. This tracking system and procedure was in place in May of 1999.

     4.    If correspondence is received from an inmate, a copy of the correspondence may be sent to the Deputy Secretary's office of the Region where the inmate is housed. This correspondence will then be tracked again by the Deputy Secretary's office. Finally, a copy of all inmate correspondence is filed with the Inmate Record Department of the Department of Corrections. This procedure was also in place in May of 1999.

     5.    I personally directed staff to search the Inmate Tracking system, and the Inmate Record Department. I personally searched the Secretary's Correspondence Record, and the Deputy Secretary of the Eastern Region's Records. No record can be located of Ronald Riley, #AK-8743 submitting any correspondence to former Secretary Horn in May or June of 1999. No information can be located on the Inmate Tracking System, the Secretary's correspondence file, the Deputy Secretary's office, or in the Inmate Record Department.

Case 1:00-cv-00485-SHR-KH   Document 18   Filed 08/28/2001   Page 16 of 143

3/20/01
**DATE**

DEBRA DELL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                    :
                                    :
        Plaintiff                   :
                                    :
        v.                          :    No. 1:00-CV-0485
                                    :    (Judge Rambo)
MARTIN HORN, et al.,                :
                                    :
        Defendants                  :

## UNSWORN DECLARATION OF
## STEPHEN DOUGHERTY

I, **STEPHEN DOUGHERTY**, hereby state under the penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.    I am presently employed by the Commonwealth of Pennsylvania, Department of Corrections ("''DOC") as the Personnel Director of the Huntingdon State Correctional Institution, ("SCI-Huntingdon") and have held that position since 1994. I have been employed by the DOC since 1986.

2.    As Personnel Director, I am familiar with the rules and regulations regarding SCI-Huntingdon employees including civil service employees, non-civil service employees, workers compensation, employee benefits and labor relations. I am also the custodian of the personal files.

3.    I am familiar with former corrections officer Julia McFadden's personnel record. Officer McFadden was considered to have resigned her position as a corrections officer at SCI-Huntingdon because of an injury which caused her to be unable to return to her pre-injury employment duties.

4.    According to her personnel record, the last day Officer McFadden worked at SCI-Huntingdon was November 16, 1996; and resigned from her position as a corrections officer on November 18, 1997.

5.    I am also familiar with Officer Dennis Hoover's personnel record.  I reviewed Hoover's Official Time Sheet ("929"), which reveals that Hoover was not working at SCI-Huntingdon on May 23, 1999.

3/20/01

**DATE**

STEPHEN DOUGHERTY

-3-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                              :
                                             :
            Plaintiff                         :
                                             :
    v.                                        :          No. 1:00-CV-0485
                                             :          (Judge Rambo)
MARTIN HORN, et al.,                          :
                                             :
            Defendants                        :

## UNSWORN DECLARATION OF
## FREDERICK K. FRANK

I, **FREDERICK K. FRANK**, hereby state under the penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.      I am currently employed by the Pennsylvania Department of Corrections, as the Deputy Superintendent at the State Correctional Institution at Cresson ("SCI-Cresson"), since January, 2000.

2.      In May, 1999, I was the Superintendent at the State Correctional Institution at Huntingdon ("SCI-Huntingdon").

3.      As the Superintendent at SCI-Huntingdon I was responsible for the overall supervision of the institution, which housed over 2100 inmates.

4.      As a named defendant in this civil action I received a copy of the complaints and the attached exhibits. I have no personal recollection of the allegations contained in Ronald Riley's complaint.

5.      I do not recall receiving the Inmate Request to Staff Member, dated May 12, 1999, identified as **Exhibit "D"** to the complaint.

6.   At no time did I engage in any retaliatory or discriminatory actions against Riley for

any reasons while at SCI-Huntingdon or at any other time.

3/21/01
_____
DATE

_K. Frank_
FREDERICK K. FRANK

-3-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,          :

        Plaintiff         :

                       :

        v.               :       **No. 1:00-CV-0485**

                       :       **(Judge Rambo)**

MARTIN HORN, et al.,      :

                       :

        Defendants     :

## UNSWORN DECLARATION OF SERGEANT DENNIS HOOVER

I, **DENNIS HOOVER**, hereby declare under the penalty of perjury, that the following is true and correct, based upon my personal knowledge.

1. I am presently employed by the Pennsylvania Department of Corrections ("DOC") as Corrections Officer at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"). I have been employed at SCI-Huntingdon since September, 1985, and have held the rank of sergeant since October, 1999. As a sergeant I am responsible for the supervision of correctional staff custody engaged in the care, custody and control of inmates in my assigned area.

2. In May, 1999, I was a correctional officer assigned to SCI-Huntingdon' visiting room. As the visiting room officer, it was my duty and responsibility to provide security and supervise inmate's visits. This included but was not limited to enforcing DOC policy during visits to assure that inmates conducted themselves in the appropriate manner and to protect against contraband being brought into the institution during visits.

3. On May 29, 1999, I was the corrections officer assigned to SCI-Huntingdon's visiting room. During the course of his visit, I observed inmate Ronald Riley and his visitor, Nina Layton.

I saw Layton's right hand on Riley's genital area and that he was covering her hand with right hand. When the pair noticed me, Riley quickly lifted Layton's hand away from his genitals.

4.    In accordance with institution policy, I issued Riley Misconduct No. A 129076, charging him with Engaging in Sexual Acts With Others or Sodomy and a violation of visiting regulations, Unacceptable Personal Contact. I wrote the misconduct based upon my observation of Riley's conduct and not my review of the visiting room video tape. (See Exhibit "A" attached).

5.    A hearing was held regarding Misconduct No. A129076 on June 2, 1999. I later learned that the hearing examiner dismissed the Engaging in Sexual Act With Others and the Sodomy charges because he believed that the contact was not a sexual act. I am aware that staff found Riley guilty of a violation of the visiting room regulations, Unacceptable Personal Contact. Other than issuing Riley Misconduct No. A129076 on May 29, 1999, I had no other contact with him.

6.    As a named defendant in this civil action I received a copy of the complaint and the attached exhibits. Attached as Exhibit "D" to the complaint are Inmate Request to Staff Members and Grievance alleging that I made derogatory comments to Riley on May 23, 1999. (See Exhibit "B" attached).

7.    I never made any derogatory or racial comments to Riley. Prior to the issuance of the misconduct I had no discussions with Riley. In addition, I was not working at SCI-Huntingdon on the day Riley alleges I made those statements.

8.    Furthermore, prior to Riley's transfer to SCI-Huntingdon in 1999, I had no contact with him. When Riley was transferred to Huntingdon in 1999 and at the time I issued Misconduct No. A129076 I had no idea that Riley had assaulted a staff member at SCI-Huntingdon in 1993.

-2-

9.     As previously stated I never made any derogatory or racial statements to Riley.  I did not issue the misconduct for any retaliatory reasons.  At no time did I engage in any discriminatory or retaliatory conduct concerning Riley while he was incarcerated at SCI-Huntingdon or while he was in the control, custody or care of the DOC or at any time.

3/3/01
_____
DATE


SERGEANT DENNIS HOOVER

-4-

**Exhibit "A"**

EXHIBIT (E)

FORM **DC-141    PART I        COMMONWEALTH OF PENNSYLVANIA**
Rev. 6-84

☑ MISCONDUCT REPORT ☐ OTHER    **DEPARTMENT OF CORRECTIONS**    **A 129076**

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AK8743 | Riley | SCIH | 1530 | 5/29/99 | 5/29/9 |

| Quarters | Place of Incident |
|---|---|
| E-3050 | Inside Visiting Room |

OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

MISCONDUCT CHARGE OR OTHER ACTION  Class 1 Cat B-4 Engaging in sexual acts with others or sodomy  Class 1 Cat D-25 violation of visiting regulation 2D unacceptable personal conduct

STAFF MEMBER'S VERSION  Sir on the above date and approx time I was working in the inside visiting Room. As I was walking past the visitors bathroom area I observed AK8743 Riley and his female visitor Linda Layton, sitting side by side Riley on his visitors left I further observed that his female visitors right hand was on his genital area and that Riley was covering her hand with his right. when they noticed me he quickly lifted his female visitors hand away from his genitals. Visit was terminat

IMMEDIATE ACTION TAKEN AND REASON  Investigated, No Further inquiry necord, inmate informed of this report

PRE-HEARING CONFINEMENT

|  | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☐ YES | | |
| ☑ NO | | |

FORMS GIVEN TO INMATE
☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERS

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN | |
|---|---|---|---|
| | | DATE | TIME 24 HO |
| _____ CO2 | A. Smith    COII | 5 29 99 | 1715 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving N |
|---|---|---|---|
| DATE | TIME | ☑ CLASS 1  ☐ CLASS 2 | |
| 5/31/99 | 08:00 | | |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything yo
will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the he

**Exhibit "B"**

EXHIBIT (D)

**DC-135A**

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

**INMATE'S REQUEST TO STAFF MEMBER**

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

| 1. TO: (NAME AND TITLE OF OFFICER) Mr. BUZMINSKY, COUNSELOR | 2. DATE 5-23-99 |
|---|---|

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) RONALD A. RILEY, AK-8743 | 4. COUNSELOR'S NAME BUZMINSKY |
|---|---|

| 5. WORK ASSIGNMENT UNASSIGNED | 6. QUARTERS ASSIGNMENT EA. 3050 |
|---|---|

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.   GIVE DETAILS.

Mr. Buzminsky,

Today as I was returning from breakfast Officer Hoover said "They should not have brought your ass back here. That is what is wrong with you stupid ass naggers. But I am going to get your ass if that is the last thing that I do." Mr. Buzminsky, I am also going to put in a complaint and send a request slip to the Supertendant.

Thank you,

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                    ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                          :
                                          :
        Plaintiff                         :
                                          :
    v.                                    :        No. 1:00-CV-0485
                                          :        (Judge Rambo)
MARTIN HORN, et al.,                      :
                                          :
        Defendants                        :

## UNSWORN DECLARATION OF JOEL KELLER

        I, **JOEL KELLER**, hereby declare under the penalty of perjury, that the following is true

and correct, based upon my personal knowledge.

        1.      I am currently employed by the Pennsylvania Department of Corrections ("DOC"),

as a Unit Manager at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"),

Pennsylvania.   I have been employed at SCI-Huntingdon since March, 1987 and have been a Unit

Manager since January, 1997.

        2.      I received a Bachelors of Arts in Secondary Education from Bloomsburg University,

in May of 1976 and a Masters Degree in Criminal Justice Administration from Marywood College,

in 1990.

        3.      My duties and responsibilities as the Unit Manager of E Block include, but are not

limited to the supervision of the operation of the housing unit.  This includes overseeing the care,

custody and control of the inmates in the housing unit, supervision of the corrections officers,

counselors and clerks assigned to the unit.   In addition, I am responsible for directing and

coordinating the security and treatment programs and other services that are provided to the inmates within the designated housing unit.

      4.     In 1987 through May 1989, I was employed as a Corrections Trade Instructor at SCI-Huntingdon. I knew the plaintiff, Ronald Riley, because he worked in the paint shop under my supervision.

      5.     In November of 1993, I was employed as a Counselor at SCI-Huntingdon. I learned at the time of Riley's transfer in 1994, that he had been transferred to SCI-Pittsburgh because he was issued a prior misconduct for assaulting a staff member. I was aware at that time that Riley assaulted officer McFadden and that his transfer was based upon separating the officer for her protection from Riley.

      6.     In late 1996, or early 1997, I was aware that Officer McFadden was placed on extended sick leave and was not working at SCI-Huntingdon. I later learned that McFadden resigned from SCI-Huntingdon, effective November, 1997.

      7.     In May of 1999, I was the Unit Manager of "E" block. I was aware that Riley was transferred to back SCI-Huntingdon because I was the Unit Manager of one of the blocks to which Riley was initially assigned.

      8.     Within a few days of Riley's transfer, his counselor, Dennis Buzminsky informed me that Riley questioned why he was transferred to SCI-Huntingdon as he believed he had a separation from the institution.

      9.     After my discussion with Buzminsky, I telephoned Major Kyle concerning Riley and any separations that he may have from the institution. Major Kyle informed me that Officer McFadden had been out of the institution on disability leave since late 1996 and resigned from SCI-

Huntingdon effective November, 1997. The separation was placed against Riley and Officer McFadden for McFadden's protection from contact with Riley. Since Officer McFadden was no longer working at this institution Riley no longer had a valid separation at SCI-Huntingdon.

10.     I informed Buzminsky that I discussed Riley's separation concerns with the Major and that since McFadden was no longer working at the institution, Riley had no active separations at SCI-Huntingdon.

11.     Shortly after I informed Buzminsky that there was no separation problem concerning Riley, I spoke with Riley. I explained to Riley that he did not have any active separations at SCI-Huntingdon, as the officer he was separated from was no longer working at the institution. I did not conduct any further or formal investigation of this matter, nor did I prepare any written reports as I considered this matter closed.

12.     As Unit Manager I was aware that Riley received a misconduct in late May, 1999 for inappropriate behavior in the visiting room.

13.     As a named defendant in this civil action I received a copy of the complaint and attached exhibits. Attached as "C" to the complaint is an Inmate Request to Staff Member dated May 12, 1999 directed to me.   (See **Exhibit "A"**).

14.     At no time before or after Riley's May 29, 1999 misconduct, do I recall receiving an Inmate's Request to Staff Member form from Riley. If I had in fact received such a written request, I would have responded in writing pursuant to DOC Administrative Directive 7.7.2.

15.     DOC Administrative Directive 7.7.2, mandates that Inmate Requests are to be responded to in writing within 72 hours of receipt. These requests along with the responses are kept

-3-

in the individual inmates institutional file, the DC-15, or the individual inmates institutional treatment file, the DC-14.

16.     I personally reviewed Riley's DC-14 and DC-15 and cannot locate Riley's Inmate Request to Staff Member, directed to me dated May 12, 1999, or any other date in May, 1999.  In addition, I can not locate any written response to that request.

17.     Other than my discussions with Buzminski, Kyle and Riley in mid-May, 1999, I had no further personal involvement with Riley.

18.     I was not involved in the issuance of Misconduct No. A129076, charging Riley with Engaging in Sexual Acts With Other or Sodomy and Unacceptable Personal Contact.

19.     In addition, as a Unit Manager, I am familiar with the DOC procedure for processing pre-release of inmates who have Community Corrections Center parole dates in the excess of thirty days and ninety days.

20.     In February of 1999, I received a memorandum from Donald Williamson, the coordinator of the Diagnostic and Classification Division of the DOC.  (See **Exhibit "B"**).

21.     In his memorandum Williamson informed DOC Superintendents that effective February 22, 1999, CL-2 Units were added to SCI-Huntingdon to accept Region 2 Community Corrections acceptees.  (Id.)

22.     As a Unit Manager, I am also aware of the classification of inmates that are incarcerated at SCI-Huntingdon.  SCI-Huntingdon houses inmates that are classified as Custody Level 4, Level 3 and Level 2 inmates.

23.     I am aware that SCI-Huntingdon routinely houses inmates paroled to CCC's located within the DOC Region II, who have a parole date in the excess of thirty days or more from the

-4-

Pennsylvania Board of Probation and Parole's action.  SCI-Huntingdon routinely houses inmates with Classification Level 2.

24.   I was aware that because Riley had a parole date to a CCC in the excess of 30 days from the Parole Board's action date and because he had no valid separations at SCI-Huntingdon, he was housed at this institution.

25.   At no time did I engage in any  retaliatory or discriminatory actions against Riley for any reasons while he was on my Unit, at SCI-Huntingdon, while incarcerated under the custody, care and control of the DOC, or at any other time.

-5-

3-27-01
<u>DATE</u>

_Joel Keller_
**JOEL KELLER**

-6-

**Exhibit "A"**

EXHIBIT (C)

| DC-135A | COMMONWEALTH OF PENNSYLVANIA |
|---|---|
| | DEPARTMENT OF CORRECTIONS |
| **INMATE'S REQUEST TO STAFF MEMBER** | INSTRUCTIONS |
| | *Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.* |

| 1. TO: (NAME AND TITLE OF OFFICER) | 2. DATE |
|---|---|
| UNIT MANAGER JOEL KELLER | 5-12-99 |

| 3. BY: (INSTITUTIONAL NAME AND NUMBER) | 4. COUNSELOR'S NAME |
|---|---|
| RONALD A. RILEY, AK-8743 | BUZMENSKY |

| 5. WORK ASSIGNMENT | 6. QUARTERS ASSIGNMENT |
|---|---|
| UNASSIGNED | EA. 3050 |

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.   GIVE DETAILS.

Mr. Keller,

I and my counselor (Buzmensky) talked about the fact that I am not supposed to be in this Institution due to a separation between me and this Institution. Sir, I am requesting a transfer because I fear for my well being if I stay in this Institution. It seems that alot of the Guards still hold that situation back in 1993 against me.

Thank you,

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY          ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |
|---|---|

**Exhibit "B"**

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**Bureau of Inmate Services**
(717) 737-6538
February 17, 1999

**SUBJECT:**  Transfer of Inmates Accepted for CCC's

**TO:**  Superintendents

**FROM:**  Donald Williamson
Coordinator
Diagnostic & Classification

As you know, Executive Deputy Beard established a new procedure for the processing of pre-release inmates who have CCC bed dates in excess of 30 days and for the processing of CCC accepted inmates in excess of 90 days, who are being paroled to a CCC.

At the present, inmates accepted into Centers in Region I are to be sent to the Outside Service Unit at Graterford. Those accepted into Centers of Region II and III are to be sent to the CL-2 Unit at SCI-Greene.

Effective February 22, 1999 we are now adding the CL-2 Unit at SCI-Huntingdon to start accepting Region 2 CCC acceptees. Region I cases should continue to go to SCI-Graterford and Region III cases should go to SCI-Greene.

As these units are eventually filled, arrangements may be made for placement at alternative regional CL-2 Unit placements and waiting lists will be established.

Thank you for your continued cooperation.

DW/jk

cc:  All Deputies
     Director Harrison
     Chief Gearhart
     Rex Hildebrand
     Robin Rutter
     Richard Wigton
     Tanya Brandt

**RECEIVED**

FEB 2 2 1999

SCI-HUNTINGDON

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD A. RILEY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No. 1:00-CV-0485 |
| | : | (Judge Rambo) |
| MARTIN HORN, et al., | : | |
| | : | |
| Defendants | : | |

## UNSWORN DECLARATION OF TIMOTHY LAUNTZ

I, **TIMOTHY LAUNTZ**, hereby declare under the penalty of perjury, that the following is true and correct, based upon my personal knowledge.

1.     I am currently employed at Juniata College, Huntingdon, Pennsylvania as the Assistant Football Coach.  I have held this position since February, 2000.

2.     Prior to my position with Juniata College, I was employed Pennsylvania Department of Corrections ("DOC"),  at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"), Pennsylvania.  I was employed at SCI-Huntingdon for approximately seventeen years, since March 1987, and have been a Unit Manager since August 1993.

3.     I received a Bachelors of Arts in Social Science from Juniata College in 1980.

4.     From August 1993, until my retirement in 2000, I was employed as a Unit Manager at SCI-Huntingdon. My duties and responsibilities as the Unit Manager included, but were not limited to the supervision of the operation of the housing unit.  This included overseeing the care, custody and control of the inmates in the housing unit, supervision of the corrections officers, counselors and clerks assigned to the unit.  I was also responsible for directing and  coordinating

the security and treatment programs and other services that are provided to the inmates within the designated housing unit. In addition, I was a member of the institution's Program Review Committee.

5.    While at SCI-Huntingdon, I was also the Training Coordinator from March , 1998 to April, 1993. In this position, I worked closely with the institution's Athletic Department. I knew the plaintiff, Ronald Riley,

6.    In June of 1999, I was a member of the institution's Program Review Committee ("PRC"). As a member of the PRC I reviewed appeals of misconducts issued to inmates for violations of the institution's rules and regulations.

7.    On June 6, 2000, the PRC reviewed Riley's appeal of Misconduct No. A129076, issued May 29, 1999, charging him with Engaging in Sexual Acts With Other or Sodomy and Unacceptable Personal Contact. For my review of the misconduct report, I was aware the hearing examiner dismissed the Engaging in Sexual Acts With Other or Sodomy charge and found Riley guilty of the Unacceptable Personal Contract charge and sanction Riley to 15 days cell restriction and 60 days loss of visiting room privileges.

8.    In his appeal, Riley requested that the PRC review the tape from the camera in the visiting room, as he believed that the tape would vindicate him. Riley further stated that at no time did his visitor have her hands in his genital area.

9.    The PRC reviewed Riley's appeal and determined that this was not a question of utilizing the tape or not, because this was not an incident caught on the tape; rather, the incident was a personal observation by an officer. After reviewing and investigating all the information in regard

-2-

to Riley's misconduct, the PRC dropped the misconduct from a Class I to a Class II misconduct and dismissed the cell restriction, but upheld the hearing examiners sixty visiting restriction.

10.    The PRC believed that the officer's observation and misconduct report provided enough information to substantiate that Riley engaged in unacceptable personal contact and that such conduct violated the Visiting Room rules and regulations.  (*See* **Exhibit "A"**).

11.    While I was employed at SCI-Huntingdon, I do not recall that I was aware that officer McFadden was assaulted or that Riley was issued a misconduct for the assault. was

12.    I was not aware at the time of the PRC review that Riley was awaiting parole to a Community Correction.

13.    At no time did I engage in any  retaliatory or discriminatory actions against Riley for any reasons while he was on my Unit, at SCI-Huntingdon, while incarcerated under the custody, care and control of the DOC, or at any other time.

DATE: _3-20-01_

TIMOTHY LAUNTZ

**Exhibit "A"**

*EA*

*G*

**DC-141   PART III**                        **COMMONWEALTH OF PENNSYLVANIA**
PROGRAM REVIEW COMMITTEE ACTION                **DEPARTMENT OF CORRECTIONS**
☑ Misconduct Appeal  ☐ Periodic Review  ☐ Other

| DC Number | Name | Institution | Date of Review | No. from PART |
|-----------|------|-------------|----------------|----------------|
| AK-8743 | RILEY, Ronald | Huntingdon | 6/4/99 | A129076 |

PROGRAM REVIEW COMMITTEE'S DECISION AND ITS RATIONALE

P.R.C. Formal Review of Misconduct #A129076

BASIS OF APPEAL:

A.  The punishment is disproportionate to the offense.

B.  The evidence was insufficient to support the decision.

DISCUSSION:

The Appellant asked the PRC to review the tape from the camera in the Visiting Room.  The Appellant feels th
the camera will vindicate him in regards to this misconduct.  The Appellant states at no time did his visitor ha
her hand in his genital area as stated in the misconduct.

PRC at SCI-Huntingdon has reviewed the Appellant's points of appeal and corresponding discussion.  W
determine that it is not a question of utilizing the tape or not, for this was not an incident that was caught on ta
but rather a personal observation by an officer.  The PRC does note that the Hearing Examiner dismissed th
sexual act charge, because he believed that it was not a sexual act.

The PRC after reviewing and investigating all the information in regards to this case feel that a reduction in Cla
charges and sanction is merited.  PRC feels that the misconduct should be dropped from a Class I to a Class
charge and that the cell restriction should be dismissed, but the 60 days loss of visiting privileges should rema
in effect.  The PRC feels that the Officer's observation and misconduct report provides enough information
substantiate that the Appellant engaged in unacceptable personal conduct and such conduct violates Visitin
Room rules and regulations.  It is for the reasons stated above that we feel the Appellant should loose visitin
privileges for a period of 60 days.

The action of the Hearing Examiner is sustained and amend from Class I #25 to Class II #35.  Drop 15 days c
restriction, keep 60 days loss of visiting privileges effective 6/2/99, and reinstate visiting privileges on 8/1/99.

:mw

**DECISION RELATIVE TO HEARING COMMITTEE'S VERDICT**

☐ Not Applicable   ☐ Sustain   ☑ Sustain-Amend   ☐ Refer Back for Further Study   ☐ Exonerate Inmate

| Names of Program Review Committee Members | Signatures | Date |
|---|---|---|
| T. R. Launtz, Unit Manager | *T.R. Lau* | 6-7-99 |
| A. S. Williamson, Deputy Supt. for Centralized Services | *ASWilliamson* | 6-7-9 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                    :
                                    :
            Plaintiff               :
                                    :
      v.                            :      No. 1:00-CV-0485
                                    :      (Judge Rambo)
MARTIN HORN, et al.,                :
                                    :
            Defendants              :

## UNSWORN DECLARATION
## OF CAPTAIN GILBERT LEVY

I, **GILBERT LEVY**, hereby declare under the penalty of perjury, that the following is true and correction, based upon my personal knowledge.

1.  ·    I am currently employed by the Pennsylvania Department of Corrections ("DOC"), as a correction officer at the State Correctional Institution at Huntingdon, ("SCI-Huntingdon"), Pennsylvania. I presently hold the rank of captain.

2.       I have been employed at SCI-Huntingdon from March, 10, 1972. I was promoted to the rank of sergeant in 1980. In 1984 I was promoted to the rank of lieutenant, and captain in 1992.

3.       Currently, I am the Security/Intelligence Captain at SCI-Huntingdon. My duties and responsibilities include, but are not limited to coordination of the drug interduction program, conduct investigations into allegations concerning inmates or staff violation of DOC or SCI-Huntingdon policy, supervision of SCI-Huntingdon's search team which conducts inmate and random cell searches and I am the liaison with outside law enforcement agencies.

4.      In May of 1999, I was employed at SCI-Huntingdon as the Security Captain.

5.      Until I received the complaint in this lawsuit, I had no knowledge of plaintiff, Ronald Riley's misconduct No. 668566, issued in November, 1993 for assaulting a corrections officer.

6.      Prior to receipt of this lawsuit I did not know that Riley received misconduct No. A-129076, issued on May 29, 1999 for Engaging in Sexual Acts With Others and for Violations of the Visiting Regulations.

7.      I do not recall having any contact with inmate Riley while he was incarcerated at SCI-Huntingdon from 1986 to his transfer in 1997.

8.      I do not recall having any contact with Riley upon his transfer to SCI-Huntingdon in May of 1999.  I do not recall having any contact with Riley concerning any of the allegations contained in his complaint.

9.      I am not presently aware of nor have I been aware of any deliberate indifference to pattern of racial discrimination or harassment against Ronald Riley.

10.     I have never engaged in racial discrimination or harassment against Ronald Riley.

11.     I am not presently aware of nor have I been aware of any alleged retaliatory actions taken against Riley.  I have never engaged in any retaliatory action regarding Riley.

12.     Prior to the receipt of the complaint in this civil action, I was not aware that inmate Ronald Riley was incarcerated at SCI-Huntingdon.

3/13/01
DATE

GILBERT LEVY
Captain, SCI-Huntingdon

-3-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD A. RILEY, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No. 1:00-CV-0485 |
| | : | (Judge Rambo) |
| MARTIN HORN, et al., | : | |
| | : | |
| Defendants | : | |

## UNSWORN DECLARATION OF JOSEPH STIDD

I, **JOSEPH STIDD**, hereby declare under the penalty of perjury, that the following is true and correct and based upon by personal knowledge.

1.      I am currently employed by the Pennsylvania Department of Corrections ("DOC") as a Hearing Examiner.  I have been employed as a hearing examiner for approximately eight years, conducting administrative factfinding hearings at SCI-Smithfield, SCI-Cresson, SCI-Huntingdon, SCI-Rockview and occasionally at SCI-Houtzdale.  I have been employed by the DOC for 23 years.

2.      I received a Bachelors Degree in Law Enforcement and Corrections from the from the Pennsylvanian State University in 1973.

3.      As a hearing examiner, I conduct administrative fact-finding proceedings concerning misconduct reports issued to inmates. My duties and responsibilities are governed by the DOC Administrative Directive, 801.   These duties include but are not limited to the review of the evidence presented at the misconduct hearing,  the determination of relevant witnesses, the interview of the witnesses, the determination of the inmates guilty or innocence, and the imposition of sanctions.

4.      On June 2, 1999, I presided at the misconduct hearing of Ronald Riley.  Riley was issued Misconduct No. A129076 charging him with Engaging in Sexual Acts With Others or Sodomy and a Violation of Visiting Room Regulations, Unacceptable Personal Conduct.

5.      The charges that were filed against Riley were based on Officer Hoover's observation of Riley's and his visitor's action.  The charges were not based on activity recorded by the visiting room's video camera.

6.      According to Hoover's eye witness testimony, he observed Riley and his female visitor, Nina Layton sitting side by side with Riley sitting on the visitor's left.  Hoover further saw that the female visitors right hand was on Riley's genital area and that Riley was covering her hand with his right hand.  Hoover reported that when Riley and his visitor noticed him, Riley quickly lifted his visitor's hand away from his genitals.  Riley's visit was then terminated.  (*See* **Exhibit "A"**).

7.      Riley's submitted a written version regarding the misconduct and testified at the June 2, 1999 misconduct hearing.  Riley plead not guilty to the misconduct and testified that his female visitors hand was in his and both were on his upper thigh and not on his genitals or crotch. (*See* **Exhibit "B"**).

8.       Riley also requested that I review the visiting room tape for that day.  I denied Riley's request and explained to him that the charges were not based on a review of the tape; rather, the charges were based on the personal observation of Corrections Officer Hoover. (*See* **Exhibit "C"**).

9.      I also denied Riley's request to present two "reference" witness, Captain Markley and Unit Manager, Timothy Launtz, as character witnesses were irrelevant to the charges.  These witnesses were denied as character witness because they did not observe the incident.  They were

not present in the visiting room at the time of the incident and therefore did not observe Riley's conduct. (*See* **Exhibit "D"**).

10.    I relied on the credibility of Officer Hoover's written testimony rather than Riley's version. Based upon information presented, I believed that Riley engaged in unacceptable personal contact during the Mary 29, 1999 visit by allowing his female visitor to deposit her hand on his genitals and while Riley covered her hand with his. This conduct violated the visiting room rules and regulations. I further determined that the conduct was not a sex act. I dismissed the charge Engaging in Sexual Acts with Others, or Sodomy and found Riley guilty of a Violation of Visiting Room Regulations, Unacceptable Personal Conduct. I sentenced him to 15 days cell restriction and 60 days loss of visiting privileges.    (*See* **Exhibit "E"**).

11.    As previously noted, I did not view the visiting room tape for May 29, 1999 because the charge(s) were not based on activity recorded on the tape. If the misconduct was based on a review of the tape, I would have personally reviewed the tape. In addition, I did not review the tape because the video camera pans the visiting room and does not cover any one area the entire time. Activity that occurs in the visiting room is not necessarily recorded by the camera. I based my decision on credibility of eye witness testimony of Officer Hoover.

12.    Prior to the June 2, 1999 misconduct hearing I cannot recall any personal contact with Riley. Prior to or during the misconduct hearing, I was not aware that Riley was recently transferred to SCI-Huntingdon or that he was awaiting parole to Community Corrections Center. Subsequent to the misconduct hearing I do not recall any personal contact with Riley.

13.    At no time did I engage in any discriminatory or retaliatory actions against Riley for any reasons while he was incarcerated at SCI-Huntingdon or at any other time.

DATE:    3/15/01

JOSEPH STDD    _Joseph Stdd_

**Exhibit "A"**

EXHIBIT (E)

**FORM DC-141**   **PART I**      **COMMONWEALTH OF PENNSYLVANIA**      **A** 129076
Rev. 6-84

☑ MISCONDUCT REPORT ☐ OTHER    **DEPARTMENT OF CORRECTIONS**

| DC Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| AK8743 | Riley | SCH | 1530 | 5/29/99 | 5/29/9 |

| Quarters | Place of Incident |
|---|---|
| E-3050 | Inside Visiting Room |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION** Class 1 CatR-4 Engaging in sexual acts with others or sodomy  Class 1 CatD-25 violation of Visiting regulation 2D unacceptable personal conduct

**STAFF MEMBER'S VERSION** Sir, on the above date and approx time I was working in the inside visiting room. As I was walking past the visitors bathroom area I observed AK8743 Riley and his female visitor Inda Layton sitting side by side Riley on his visitors left. I further observed that his female visitors right hand was on his genital area and that Riley was covering her hand with his right when they noticed me he quickly lifted his female visitor's hand away from his genitals. Visit was terminated

**IMMEDIATE ACTION TAKEN AND REASON** Investigated, No further inquiry needed, inmate is informed of this report

**PRE-HEARING CONFINEMENT**

| | IF YES | |
|---|---|---|
| | TIME | DATE |
| ☐ YES | | |
| ☑ NO | | |

FORMS GIVEN TO INMATE
☑ REQUEST FOR WITNESSES AND REPRESENTATION    ☑ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN | |
|---|---|---|---|
| | | DATE | TIME 24 HOUR |
| COII | A. Smith    COII | 5 29 99 | 1715 |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving Not |
|---|---|---|---|
| DATE | TIME | ☑ CLASS 1  ☐ CLASS 2 | COI |
| 5/31/99 | 08°° | | |

**NOTICE TO INMATE**

**Exhibit "B"**

DC-141    **PART II C**
Rev. 6-84    HEARING SUPPLEMENT
INMATE VERSION AND WITNESS STATEMENTS

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

Huntingdon

| DC Number | Name | | Institution | No. from PART |
|---|---|---|---|---|
| AK-8743 | Ronald A. Riley | | | |

INMATE'S VERSION

Sir, on May 29th 1999 I was on a visit with my visitor (Nina Lagtu). As us where sitting in the front section of the visiting area my visitor and I where holding hands. My hand was on top of her hand as our hands rested on my upper leg. Where they remained until officer Hoover approached us and informed me that my visit was cancelled. At no time was her hand on my genitals nor did I quickly lift her hand for any reason.

Sir, a review of the visiting room film from the camera by the entrance of the inside visiting room will verify this fact because I was sitting right in front of the camera. In the 14½ years that I was incarcerated I have never received a warning or infraction for this type of behavior.

Sir, at no time did I or my visitor violate or disregard any visiting room rule/regulations. Nor were we warned of any such activity at any time!

Sincerely,

*[signature]*

Video entered into evidence requested!

**Exhibit "C"**

DC-141     PART II A           COMMONWEALTH OF PENNSYLVANIA
Rev 5-84                        DEPARTMENT OF CORRECTIONS
INMATE REQUEST FOR
REPRESENTATION AND WITNESSES

| DC Number | Name | Institution | Date | Number as on |
|---|---|---|---|---|
| AK-8743 | Ronald A. Riley | Huntingdon | 5-30-99 | |

You have been charged with a misconduct. You may request assistance and/or witnesses to appear at your hearing
completing the section(s) below.

In order to have assistance or witnesses at your hearing, you must complete this form and present all copies to one of
your housing officers no later than 9:00 a.m. the first working day after you receive notice of the misconduct.

Assistance:    [X]  I do not request assistance
               [ ]  I request assistance by _____
                    (The person requested must be willing to assist you)

Witnesses:     You may request witnesses in accord with DC-ADM 801. State the relevance and
               importance of the testimony the witness will give.

---

1. Name of Witness:   No.   If Inmate Quarters

Captain Markly

Why is this person's testimony relevant and important?

REFERENCE!

**DO NOT WRITE IN THIS SECTION**
For Use by Hearing Examiner

Witness permitted?  NO  If not, why not?

(See below)

---

2. Name of Witness:   No.   If Inmate Quarters

Tim Lawtz  Unit Manager

Why is this person's testimony relevant and important?

Reference!

Witness permitted?  No  If not, why not?

Character witnesses
are not relevant
witnesses; not present
at time of incident to
observe.

---

3. Name of Witness:   No.   If Inmate Quarters

Why is this person's testimony relevant and important?

Witness permitted?   If not, why not?

---

_____
Inmate's Signature

This section to be completed by Housing Officer only

Received completed form  1050  hours  5-30-99
                         Time         Date

_____
Hearing Examiner's Signature

**Exhibit "D"**

**DC-141**
Rev. 6-84
**PART II B**
DISCIPLINARY HEARING REPORT

**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF CORRECTIONS

| DC Number | Name | Institution | Hearing Date | Hearing Time | No. from Pa |
|---|---|---|---|---|---|
| AK-8743 | Riley, Ronald | SCIH | 6/2/99 | 0917 | A129076 |

**INMATE PLEA**
☐ Guilty
☒ Not Guilty
☐ No Plea
☐ Other

**Verdict**
☒ Guilty (1)
☐ Not Guilty

**HEARING ACTION**

**CHARGES**
4 ~~Engaging in sexual acts with others, or sodomy~~
25 Violation of visiting regulations (unacceptable personal conduct)

**FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED** Pleads NG. Testifies Submits written version his female visitor's hand was in his and both rested on his "upper thigh not my crotch area and not on my genitals." Requests HEX to view video tape. HEX notes that MC #A129076 is based on personal observation of CO Hoover not a review of video tape. Riley's request for staff witnesses denied (as per Part II A). Credence extended to written testimony of CO Hoover over Riley's version. HEX believes Riley engaged in unacceptable personal conduct while on a visit status by allowing his female visitor to deposit her hand on his genital area while covering her hand with his. Such conduct violates V.R. rules & regulations and serves to establish charge 25 but is not viewed as a sex act. Guilty: 25. (Dismiss: 4.) Sanction: 15 days Cell Restriction eff 6/2/99. Copy of CR policy attached. 60 day loss of visiting privileges

☑ YES ☐ NO
☐ YES ☐ NO
☐ YES ☐ NO
● YES ☐ NO

The inmate has heard the decision and has been told the reason for it and what will happen. eff. 6/2/99 Except legal & spiritual
The circumstances of the charge have been read and fully explained to the inmate.
The opportunity to have the inmate's version reported as part of the record was given.
The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review.

SEE APPENDICES
☑ IIA

NAME(S) OF HEARING EXAMINER/COMMITTEE
(TYPED OR PRINTED)
Mr. J. Stidd
Hearing Examiner

Hearing Report and all appended information must be signed. Signature indicates finished report with appendices.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                    :
                                    :
            Plaintiff               :
                                    :
    v.                              :        No. 1:00-CV-0485
                                    :        (Judge Rambo)
MARTIN HORN, et al.,                :
                                    :
            Defendants              :

## UNSWORN DECLARATION
## OF DONALD WILLIAMSON

I, **DONALD WILLIAMSON**, hereby declare under the penalty of perjury, that the following is true and correction, based upon my personal knowledge.

1.    I am currently employed by the Pennsylvania Department of Corrections ("DOC"), Bureau of Inmate Services, as the Diagnostic and Classification Coordinator. I have been employed by the DOC for approximately 29 years, and have been the Diagnostic and Classification Coordinator since April, 1989.

2.    I received a Bachelors Degree in Sociology from Shippensburg University in 1970, and a Master's Degree in Counseling from Shippensburg University in 1976.

3.    As Diagnostic and Classification Coordinator, my duties and responsibilities include, but are not limited to the overall responsibility for inmate transfer within the DOC. This includes approval of and transferring inmates to an appropriate and approved DOC correctional facility, and making the arrangements to facilitate the actual transfer of the inmate. In addition, I am familiar with and participate in the designation of inmate classification levels. In 1992, I assisted in the

development of the DOC current Pennsylvania Additive Classification Tool known as "PACT". PACT contains the criteria that establish the classification level of an inmate.

4.    Pursuant to DOC regulation when an inmate is transferred for a parole to a Community Corrections Center ("CCC") with a parole date in excess of thirty days or more, the inmate is transferred to one of three correctional institutions.  The institution that the inmate is transferred to is determined by the location of the CCC.  Effective February 22, 1999, inmates paroled to CCC's in Region I are transferred to SCI-Graterford, inmates paroled to CCC's in Region II are transferred to SCI-Huntingdon and inmates parole to CCC's in Region III are transferred to SCI-Greene.  (See **Exhibits "A" and "B"** attached).

6.    Prior to the addition of the CL-2 Unit at SCI-Huntingdon in February, 1999, inmates in Region II and III were sent to SCI-Greene.  (See **Exhibit "C"** attached).

7.    These three institutions, SCI-Greene (Region III); SCI-Huntingdon (Region II); and SCI-Graterford (Region I) are designated to receive inmates awaiting parole to CCC's because they have significant minimum custody level housing available.  By allowing placement of an inmate in a less secure environment for eventual placement into the outside community, housing becomes available at the inmate's prior facility for inmates who need a more secure environment.

8.    As Diagnostic and Classification Coordinator, and based upon my familiarity and development of PACT, I am also familiar with the custody level assigned to inmates.  The DOC has five custody levels that are assigned to inmates.  These classification levels are based upon the security concerns of each inmate.

9.    Custody Level 5 inmates require the most secure housing within the DOC.  The inmates are housed in either the Restricted Housing Units ("RHU's"). Special Management Units

-2-

("SMU"s), or the DOC Long Term Problematic Segregation Unit at SCI-Pittsburgh ("SCI-Pittsburgh").

10.     Level 4 inmates are maximum security level inmates, Level 3 inmates are medium security inmates, Level 2 inmates are minimum security inmates, and once an inmate is housed in a CCC he obtains Level 1 custody status.

11.     Level 2 custody inmates can be housed at any of the state correctional institutions. However, once an inmate has been granted parole to a CCC with more than a 30 day in advance parole date, the inmate is to be transferred to the appropriate institution within the Region of the CCC.

12.     I am familiar with the events surrounding the transfer of plaintiff, Ronald Riley, #AK-8743, as I approved and facilitated his transfer to SCI-Huntingdon.

13.     In April 1999, I received information from the transferred institution, SCI-Pittsburgh, that Riley was approved to be released on parole to a CCC upon the completion of certain terms and conditions established by the Pennsylvania Board of Probation and Parole. ("Board").

14.     Once an inmate has been approved to be released to a CCC by the Board, it is the duty and responsibility of the DOC, to transfer the inmates to the appropriate correctional institution to await placement to the CCC. Neither the Board nor its Chairman has the authority regarding an inmate's transfer to a DOC institution.

15.     Riley was approved to be paroled to a CCC located in Harrisburg, Pennsylvania. Because Harrisburg CCC is located within the area known to the DOC as Region 2, Riley's transfer petition listed SCI-Huntingdon as the institution to which he was to be transferred.

-3-

16.    I received Riley's transfer petition in April, 1999.  I initially denied the transfer because a staff separation was noted on Riley's files.  I was then contacted by the petitioning institution, SCI-Pittsburgh to verify the separation.  I then contacted SCI-Huntingdon to further inquire about the separation and learned that the separation was no longer valid, as the staff member Riley was separated from was on disability leave and was no longer working at the institution.

17.    Riley had parole date to a CCC that was more than 30 days in advance of the Board's action.  SCI-Huntingdon was the designated institution to receive Custody Level 2 (CL-2)inmates paroled to a CCC  Center within Region II with more than a 30 day in advance parole date.  Riley no longer had a valid staff separation at SCI-Huntingdon.  I approved Riley's transfer and on May 12, 1999, he was transferred to SCI-Huntingdon.

_3/12/01_
**DATE**

_Donald Williamson_
**DONALD WILLIAMSON**

-5-

Henry Rauser, Appellant, v. Martin Horn

Filed 02/26/2001

[7] Federal Civil Procedure ⇔2491.5
170Ak2491.5

Material issue of fact existed as to whether state
inmate's assertion of his constitutional right to
freedom of religion was motivating factor in prison
officials' decision to transfer him to different
correctional facility, cut his wages, and deny him
parole, precluding summary judgment for officials
on inmate's retaliation claim. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.
*331 Jon Romberg, Newark, NJ, Counsel for
Appellant.

Calvin R. Koons, Harrisburg, PA, Counsel for
Appellees.

Before: NYGAARD, ALITO, and ROSENN,
Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

**1 In this appeal, we are called upon to announce
the burden of proof that a prisoner must shoulder
when he alleges that prison officials have retaliated
against him for exercising his constitutional rights.
The plaintiff, Henry Rauser, is an inmate serving his
eighth year of a five to ten year sentence for a drug-
related offense. He filed this suit in the United
States District Court for the Western District of
Pennsylvania alleging that the officials at the
Pennsylvania State Correctional Facility at Camp
Hill violated his First Amendment right to religious
freedom and retaliated against him when he insisted
on exercising that right. The District Court held that
the prison officials had violated the Establishment
Clause as a matter of law and enjoined further
violations. However, it dismissed Rauser's
retaliation claim on summary judgment. Although
the former decision is not challenged on appeal,
Rauser timely appealed from the grant of summary
judgment on *332 his retaliation claim. For the
following reasons, we reverse and remand for
further proceedings consistent with this opinion.

I.

In 1997, Rauser became eligible for parole. In
preparation for his parole review, the Pennsylvania
Department of Corrections ("the DOC") issued a

Prescriptive Program Plan for Rauser, which
required him to complete a series of behavioral
programs before the DOC would recommend his
release. Among the programs Rauser was required
to complete were Alcoholics Anonymous ("AA")
and/or Narcotics Anonymous ("NA"). Both of these
programs are centered on a belief in a Supreme
Being and require participants to accept God as a
treatment for their addictions.

After completing a related religious substance abuse
program known as the "New Values Ten Week
Twelve Step Lecture," Rauser objected to continuing
in AA/NA on the basis of his own religious beliefs.
In spite of this objection, the DOC refused to consider
recommending Rauser for parole unless he
participated in AA or NA. The DOC did not offer
Rauser a non-religious alternative to these programs
until after he had filed the complaint in this action.

Rauser alleges that the Department took three
actions in retaliation for his insistence on religious
freedom. First, the DOC transferred Rauser from
its Correctional Facility in Camp Hill, Pennsylvania,
to a facility in Waynesburg, Pennsylvania, far from
his home and family. When he arrived at the
Waynesburg facility, the DOC changed Rauser's job
classification from Class 3, Step D, the highest level
attainable by an inmate, to Class 1, Step A, the
lowest possible designation. This reclassification
was accompanied by a dramatic drop in Rauser's
rate of pay, from $.41 per hour to $.18 per hour.
Finally, the DOC refused to recommend Rauser for
parole, stating that "this recommendation is based on
the incompletion of programs stipulated in
[Rauser's] PPP, i.e.,[the] D[rug] & A[lcohol]
program."

On September 16, 1998, several months after he
received a negative parole recommendation, Rauser
filed this 42 U.S.C. § 1983 action in the United
States District Court for the Western District of
Pennsylvania. His complaint alleged that the DOC's
requirement that he participate in religious addiction
therapy violated the Establishment and Free
Exercise clauses of the First Amendment. He
sought declaratory and injunctive relief, as well as
monetary damages for these violations. Rauser also
sought declaratory, injunctive and monetary relief
for the allegedly retaliatory transfer and wage
reduction. The District Court referred Rauser's
case to Magistrate Judge Francis X. Caiazza (MJ).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**2 The defendant prison officials moved to dismiss Rauser's complaint for failure to state a claim or, alternatively, for summary judgment. Judge Caiazza issued a report recommending that the defendants' motion for summary judgment on Rauser's Free Exercise claim be denied because the AA/NA requirement violated the Establishment Clause as a matter of law. The MJ further recommended that the defendants be ordered to allow Rauser to decline to participate in religious programs and that all entries in the DOC's files adversely affecting Rauser's parole eligibility based on his refusal to complete such programs be expunged. The District Court adopted these recommendations, none of which are challenged on appeal.

Judge Caiazza also recommended that the District Court grant the defendants' motion for summary judgment on Rauser's retaliation claim. The District Court adopted this recommendation in an Order dated December 3, 1999, holding that Rauser enjoyed no constitutional protection against retaliation because he possessed no protected liberty interest in early parole, prison wages, or a specific place of confinement. This order is the subject of this *333 appeal. We hold that the relevant question is not whether Rauser had a protected liberty interest in the privileges he was denied, but whether he was denied those privileges in retaliation for exercising a constitutional right. [FN1] Because Rauser has demonstrated that material questions of fact relevant to this inquiry exist, we reverse the order of summary judgment and remand this case for trial.

> FN1. The prison officials concede on appeal that the District Court failed to apply the proper legal standard for evaluating constitutional retaliation claims. Accordingly, we have concluded that oral argument would not materially assist in the resolution of this appeal. We therefore order the case submitted without oral argument.

## II.

[1] In a recent case entitled *Allah v. Seiverling,* 229 F.3d 220, 224-25 (3d Cir.2000), this court held that, "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right." (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 386 (6th Cir.1999)(*en banc*)).

Accordingly, the law of this circuit is clear that a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied. Our primary purpose in this appeal, therefore, is to set forth with specificity the elements of a prisoner's cause of action for retaliation and the burden of proof he must carry to succeed.

[2] As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected. *See Thaddeus-X,* 175 F.3d at 389; *Drexel v. Vaughn,* 1998 WL 151798 at *7 (E.D.Pa.) (determining that prisoner had engaged in constitutionally protected conduct before proceeding with retaliation inquiry). In this case, the District Court determined that Rauser's refusal to participate in a religious program was protected by the First Amendment. This conclusion has not been challenged on appeal.

[3][4] Next, a prisoner litigating a retaliation claim must show that he suffered some "adverse action" at the hands of the prison officials. *See Allah,* 229 F.3d at 225. Under *Allah,* a prisoner-plaintiff satisfies this requirement by demonstrating that the action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Id.* Here, Rauser has produced evidence that he was denied parole, transferred to a distant prison where his family could not visit him regularly, and penalized financially. The prison officials do not dispute this evidence. Accordingly, Rauser has presented sufficient evidence of adversity to survive summary judgment.

**3 Once these two threshold criteria are met, there remains the question of how a prisoner-plaintiff must go about proving a causal link between the exercise of his constitutional rights and the adverse action taken against him. This is a question of first impression in this circuit. In *Mount Healthy Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court used a burden-shifting framework to decide a retaliation case that arose in the public employment context. The Court held that the plaintiff bore the initial burden of proving that his constitutionally protected conduct was "a substantial or motivating factor" in the decision to discipline him. *See id.* The burden then shifted to the defendant to prove by a

241 F.3d 330                                                                 **Page 4**
(Cite as: 241 F.3d 330, *333, 2001 WL 185120, **3 (3rd Cir.(Pa.)))

preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity. *See id.* In this appeal, we join the several circuits that have imported the *Mount Healthy* burden-shifting framework into the prison context. [FN2] *See Thaddeus-X,* **334** 175 F.3d at 399; *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Babcock v. White,* 102 F.3d 267, 275 (7th Cir.1996).

> FN2. *But see Goff v. Burton,* 7 F.3d 734, 737 (8th Cir.1993). Cf. *Woods v. Smith,* 60 F.3d 1161, 1166 & n. 26 (5th Cir.1995) (citing *Mount Healthy* but stating that the prisoner must establish that but for the retaliatory motive the complained of incident would not have occurred); *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979) (same).

[5][6] We recognize that the task of prison administration is difficult, and that courts should afford deference to decisions made by prison officials, who possess the necessary expertise. In *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court held that a prison regulation that impinges on the constitutional rights of an inmate is valid if it is "reasonably related to legitimate penological interests." In adopting the *Mount Healthy* framework, we do not discard the deferential standard articulated in *Turner.* Rather, we incorporate the balancing test announced in *Turner* into the *Mount Healthy* burden-shifting framework. This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.

### III.

[7] Applying the standard discussed above to the case before us, we conclude that summary judgment was improper. In determining whether summary judgment is proper, the court must view the evidence and all justifiable inferences to be drawn

therefrom in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rauser has presented a great deal of evidence from which a reasonable jury could conclude that the prison officials penalized him because he insisted on exercising his First Amendment rights. First, Rauser has sworn that a DOC official warned him shortly before his transfer not to "try and disrupt their alcohol programs" with constitutional challenges and threatened that such challenges would result in a denial of parole. Second, the DOC acknowledged that its failure to grant Rauser a favorable parole recommendation was due to his "failure to complete prescribed treatment plans," specifically AA/NA.

**4 Finally, Rauser has demonstrated a suggestive temporal proximity between his insistence on his First Amendment rights and his transfer and wage reduction. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir.2000)(stating that suggestive timing is relevant to causation in retaliation case). The District Court noted that Rauser first raised his religious objections "prior to January 1998." On January 26, 1998, the DOC transferred Rauser to the Waynesburg facility and cut his wages by more than half. On the eve of that transfer, a DOC official warned Rauser that if he continued to disrupt prison programs with Constitutional challenges, he would be punished with a denial of parole.

### IV.

Viewing the evidence as a whole in the light most favorable to Rauser, we conclude that a reasonable jury could determine that Rauser's protected conduct was a motivating factor in the DOC's decision to transfer him, cut his wages and deny him parole. The DOC has offered no evidence to suggest that these actions were taken for any other reason, penologically legitimate or otherwise. Accordingly, the District Court's grant of summary judgment will be reversed and the case remanded for further proceedings consistent with this opinion. Costs to be taxed against the appellee.

**END OF DOCUMENT**

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3  RONALD A. RILEY,                :
                          PLAINTIFF :
4                                   :
                  VS              :    NO.  1:CV-00-0485
5                                   :
   MARTIN F. HORN, ET AL,          :
6                          DEFENDANT :

7

8

9

10            DEPOSITION OF: RONALD A. RILEY

11            TAKEN BY:      DEFENDANTS

12            BEFORE:        BETH A. KRUPA, REPORTER
                            NOTARY PUBLIC
13
14            DATE:          JANUARY 9, 2001, 10:16 A.M.

15            PLACE:         SCI HUNTINGDON
                            HUNTINGDON, PENNSYLVANIA
16

17                                   RECEIVED
                              Office of Attorney General
18  APPEARANCES:
                                    JAN 2 2 2001
19     RONALD A. RILEY, PRO SE
                                    Litigation Section
20            FOR - PLAINTIFF

21     OFFICE OF ATTORNEY GENERAL
       BY: MARYANNE LEWIS, ESQUIRE
22
              FOR - DEFENDANTS
23

24
   ALSO PRESENT:
25   SETH A. MENDELSOHN, ESQUIRE

2

INDEX

WITNESS

| FOR DEFENDANTS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ronald Riley | 3 | | | |

GEIGER & LORIA REPORTING SERVICE, 2408 PARK DR., SUITE B, HBG., PA 17110   717-541-1508 OR 1-800-222-4577

1
2          RONALD A. RILEY, called as a witness, being
3    sworn, testified as follows:

4

5                    DIRECT EXAMINATION

6

7    BY MS. LEWIS:
8         Q         Once again, good morning, Mr. Riley.  I am
9    Maryanne Lewis with the Pennsylvania Office of Attorney
10   General and I represent the defendants in the lawsuit that
11   you filed against them.  With me here today is Seth
12   Mendelsohn.  He's also an attorney with our office.
13                   MR. MENDELSOHN:  Good morning, sir.
14   BY MS. LEWIS:
15        Q         I'm sure you recall that the case is
16   captioned Riley versus Horn, et al, filed in the Middle
17   District of Pennsylvania to number 00-0485.
18        A         Yes, ma'am.
19        Q         We're here today for the purpose of taking
20   your deposition in regard to that complaint.  Mr. Riley,
21   have you ever been deposed before?
22        A         No.
23        Q         Okay.  Let me briefly tell you what a
24   deposition is all about.  A deposition is a device or a
25   method for gathering information.  It's under the Federal

4

1    Rules of Civil Procedure known as discovery.

2         A        Yes, ma'am.

3         Q        I think you're familiar with discovery,

4    because we filed some in this case.  As you know, this is

5    an oral testimony.  It's taken under oath and the reporter

6    here is reporting all your responses.  What I'm going to

7    do, I'm going to ask you a series of questions about the

8    facts and the allegations that are in your complaints.

9         A        Yes.

10        Q        Before we get into the actual deposition, I

11   just need to put some of these preliminary or housekeeping

12   matters on the record.  The first thing is that you have

13   options regarding the reading and signing of your

14   deposition.

15            The first option is that you can read,

16   review it, sign it, to its accuracy or correctness, and

17   then send it back to the reporter.  She's going to send you

18   a copy of the transcript, you have those 30 days to review

19   it, make any corrections that you want, sign it and mail it

20   back to her.  You have to be aware there's costs involved

21   in that, depending on the length and the postage, it could

22   run anywhere from $20 or more.

23            The second option is that you can waive the

24   reading and signing and assume and trust that the

25   stenographer took down everything correctly and accurately.

1   Do you have a choice?

2           A           I'll take the second choice.

3           Q           Okay.  That's fine.  The second item that we

4   need to put on the record is in regard to any objections

5   that you may have about the questions that I ask you.

6   Under the Federal Rules, if you feel that a question is not

7   proper, you have the right to object to that question.  If

8   for some reason you feel that the question isn't relevant,

9   you can object to it based on relevancy for the purpose of

10  this deposition.  You have to answer the question and

11  preserve it on the record or note on the record that you

12  objected.

13          The other alternative is you can simply hold

14  and waive all objections until the time of trial if we get

15  there, that way you don't have to worry about stopping and

16  objecting and save all your objections until the end.  What

17  do you want to do with your objections, put them on record

18  now or waive them until the time of trial?

19          A           I'll save them for trial.

20          Q           Okay.  The other thing is just remember that

21  this is a written record and your responses have to be loud

22  and clear and I'll try to slow down myself and the

23  responses have to be verbal, so you can't shake your head

24  or shrug your shoulders.  If your answer is yes, say yes.

25  If it's no, say no.  If you don't know, just say you don't

1   know.

2          Mr. Riley, if you don't understand the

3   question or you think the question is unclear, just stop,

4   ask me to repeat it or rephrase it and I'll do that for

5   you.  Do you understand that?

6       A       Yes, ma'am.

7       Q       If later in the deposition you remember

8   something, let's say a question jars your memory about

9   something you answered before that was incorrect or you

10  feel wasn't the right answer, just stop and say, hey, I

11  need to go back and then we'll correct that answer.  Do you

12  understand that?

13      A       Yes, ma'am.

14      Q       If I ask you a question, then it's

15  fair to -- it's fair to me that I understand that you both

16  heard and understood the question, correct?

17      A       Yes, ma'am.

18      Q       You're under oath today, you're obligated to

19  tell the truth.  Do you understand that?

20      A       Yes, ma'am.

21      Q       Finally, is there anything that would

22  prevent you from testifying accurately today, such as being

23  under the influence of any drugs or alcohol?

24      A       No, ma'am.

25      Q       Okay.  I think we've covered all the

1    necessary background that we need to, Mr. Riley.  Can you

2    state your full name.

3         A        Ronald Anthony Riley.

4         Q        And, Mr. Riley, what sentence are you

5    currently serving?

6         A        Nine to 18.

7         Q        Can you explain what 918 is?

8         A        Nine years to 18 years.

9         Q        What are the charges?

10        A        Rape and burglary.

11        Q        Okay.  I see you have your complaint there.

12        A        Yes, ma'am.

13        Q        What I'm going to do, we're going to go

14   through the complaint paragraph by paragraph beginning on

15   Page 3.

16        A        Page 3, okay.

17        Q        Mr. Riley, you state that on or about

18   October 1993 you were charged with a misconduct with an

19   assault on Officer McFadden.  Can you tell me a little bit

20   about that?

21        A        Okay.  I was in the trailers at the time.

22   Officer McFadden was serving ice cream.  This was around

23   7:30, 7, 7:30.  I was in mod 2, Officer Wilson was in mod

24   2, Officer Fegley was in mod 1.  No female officers

25   are escorted -- go through the trailers without an escort.

1   You have to be escorted, because there are no walls.

2            There are partitions, but there's no walls

3   and inmates walk around in there sleeping garments, so she

4   delivered the ice cream to the day room, where all the

5   inmates are permitted to congregate inside the trailers.

6            She said that someone approached her and

7   reached out and tried to grab her and later on -- she went

8   back inside the institution.  Around 10:00 at night, they

9   came and got me and said Mr. Riley, do you want to pack

10  your stuff up?  You're going back inside the jail.  I said

11  for what.  They said pack your stuff up.  We're taking you

12  back inside the jail.

13           Shortly after that, I was informed -- well,

14  once I got in the jail, I received a misconduct, a

15  misconduct that said it was me.

16       Q         Okay.

17       A         Later on at the hearing, I found out that I

18  was identified by a tall black man wearing a long white

19  shirt.  As she went back into the jail from the mods, she

20  asked to pull my file to the center, command center.  She

21  asked to see Riley's file and when she read my file, later

22  on I received the misconduct.

23           I spoke with Officer Wilson and Officer

24  Fegley and they stated that she did not report that

25  incident to them when they escorted her to the trailers, to

1    the day room, and that they never seen me come into the day

2    room at all during that time.

3         Q         They said this at the misconduct?

4         A         They said that to the administration.

5         Q         They said that at the misconduct hearing?

6         A         No, they refused to show.  They said that to

7    administration.  They were fully aware of that fact.

8         Q         After the misconduct was issued, you had a

9    misconduct hearing, correct?

10        A         Yes.

11        Q         I think that's referred to in Paragraph 20?

12        A         Yes.

13        Q         And at that misconduct hearing you were

14   found guilty; is that correct?

15        A         Yes, the hearing examiner said the reason

16   why I'm finding you guilty is because one of your witnesses

17   that was in the pod with you testified to the fact that

18   there was a possibility that you could not have been in the

19   pod at the time.  There was two witnesses.

20             One testified I was sitting there looking at

21   television, the other one testified I was sitting there

22   watching television, but he went in the back and started

23   talking to someone, so the hearing examiner asked him,

24   listen, Mr. So and So, is it possible that Mr. Riley could

25   have left the pod at that time.

1          He said, sure, it's possible.  But when I

2    was in the pod, Mr. Riley was sitting right there watching

3    television.

4          Q          Okay.  Now, did you appeal this misconduct?

5          A          Of course I appealed it.

6          Q          What happened as a result of the appeals?

7          A          They went along with the hearing examiner.

8          Q          Okay.

9          A          I appealed it to Camp Hill also, and they

10   told me it was more than likely that I was the tall black

11   man wearing the long white shirt of which there's 20 of

12   them out there in the trailers at the time, tall black men

13   wearing long white shirts, thermal shirts like this that we

14   all wear in the jail during the wintertime.

15         Q          Okay.  Let's flip over, I apologize.

16         A          No problem, I can flip it.

17         Q          Let's go to Paragraph 24.

18         A          Okay.

19         Q          You were transferred in April after -- in

20   '94 to Pittsburgh?

21         A          Yes, ma'am.

22         Q          You have in your complaint that a separation

23   was placed on you?

24         A          Me and Huntingdon, Huntingdon kicked me out

25   for allegedly assaulting Officer McFadden.

1    Q        How did you learn about the separation?

2    A        How did I learn about it?

3    Q        Yes.

4    A        Well, they told me that in the hearing.

5    Q        Okay.  What did they tell you in the hearing

6    about the separation?

7    A        Mr. Riley, due to your activities, there

8    will be a separation placed upon you and this institution.

9    You will be transferred.  They also told me that in the

10   seven PCRA hearings that I received in four months time

11   that I was incarcerated in the hole, G block.

12   Q        SCI Huntingdon, but did it name an

13   individual?

14   A        SCI Huntingdon.

15   Q        Okay.  Paragraph 25.

16   A        Yes, ma'am.

17   Q        You explained that you received five

18   one-year setbacks from the Pennsylvania Board of Probation

19   and Parole due to the misconduct?

20   A        Yes, ma'am.

21   Q        And you were then again granted parole at

22   SCI Pittsburgh, March 2nd, 1999?

23   A        Yes, ma'am.

24   Q        Do you recall if there were any conditions

25   that were placed upon the granting of parole when the

12

1    parole was granted?

2         A         Yes, there was a whole pile of them.  I have

3    a copy of it attached to my complaint.

4         Q         Yes, you do.

5         A         As Exhibit A, I think.  Would you like me to

6    read every single one attached to that?

7         Q         No, I'm asking you, you're aware that there

8    were -- we'll point to a couple of them.

9         A         I'm aware of the conditions, yes, ma'am.

10        Q         So the conditions that are outlined in

11   Exhibit A are true and correct, the conditions that are

12   listed on your Exhibit A?

13        A         On the green sheet?

14        Q         Yes.

15        A         Yes, ma'am.

16        Q         Okay.  All right.  Then you refer to, on

17   Paragraph 26, Exhibit B that was a memo from Paul O'Conner,

18   director of the regional -- director of region 2 parole?

19        A         Yes.

20        Q         And in that exhibit it lists that your

21   release date is November 22nd; is that correct?

22        A         Yes.

23        Q         Although the memo was dated March 24th?

24        A         Yes, transfer.

25        Q         I think the second paragraph indicates that

1    the facility, the community corrections center that you

2    were to be transferred to was in Harrisburg, Pennsylvania,

3    correct?

4         A         Yes, ma'am.

5         Q         Then I think the third to the last paragraph

6    it makes a mention about going to SCI Greene, and I think

7    the sentence is -- let me read it for you -- if he is not a

8    problematic prerelease case and if institution staff

9    recommend parole, arrangements should be made in accordance

10   with the established procedures for transfer to SCI Greene

11   for placement in outside units?

12        A         Yes, ma'am.

13        Q         Correct.  Okay.  And what happens next is

14   you indicate in Paragraph 27 that you are transferred to

15   SCI Huntingdon on May 12th --

16        A         Yes, ma'am.

17        Q         -- 1999?

18        A         Yes.

19        Q         Okay.  Paragraph 28, you state that when you

20   arrived at Huntingdon you spoke with Counselor Buzminsky?

21        A         Yes, at the inmate reception committee.

22        Q         Okay.  Can you tell me a little bit about

23   your conversation with Counselor Buzminsky?

24        A         When I came off the van, they took me on D

25   Block and I went to the back of the block.  The lieutenant

1    was there and Officer Buzminsky was sitting in the chair.

2    They asked me to sit down.  Officer Buzminsky opened up my

3    file and read a few pages and slid it over to the

4    lieutenant and said, listen, we cannot allow Mr. Riley back

5    into this institution.  We have a separation on Mr. Riley

6    due to an incident that happened in 1993.  He said I

7    strongly recommend that Mr. Riley is not admitted back into

8    this institution.

9         Q         Now, Mr. Buzminsky said this to you?

10        A         No, he said it to the lieutenant.

11        Q         Lieutenant who?

12        A         I don't remember his name.

13        Q         Okay.  What happened after that?

14        A         The lieutenant turned to me and said Mr.

15   Riley, what do you think about it?  I explained to him the

16   same situation that happened in the mods and that I was

17   under the impression that I would not be transferred back

18   to Huntingdon due to the act of separation between me and

19   Huntingdon, due to that assault and that I was going to

20   Greene County's outside unit.

21                  I didn't find out I was going to Huntingdon

22   until I got on the bus.  They said Mr. Riley, you're going

23   to SCI Huntingdon.  I said that's impossible, there's a

24   separation between me and that institution.

25        Q         Okay.  Did Mr. Buzminsky make any calls

15

1    while in your presence?

2          A          No, there's no telephone right there.

3          Q          Okay.  After you had the discussion with Mr.

4    Buzminsky, did he contact you again and give you any

5    additional information about this?

6          A          No, I contacted him.

7          Q          You contacted him again?

8          A          Yes.

9          Q          And then what happened?

10         A          Well, they assigned me to E Block.  After I

11   left the reception, inmate reception committee, they took

12   me about middle of the block where they had the search and

13   strip down team, where they went through your boxes and all

14   that stuff and told you what you can and what you can't

15   have.  Then I went to orientation.  From the orientation, I

16   was assigned to E Block.

17         Q          Okay.

18         A          On E Block, I saw Mr. Buzminsky and I knew

19   the unit manager from my previous incarceration in this

20   institution.

21         Q          And that was Mr. Keller?

22         A          Yes, ma'am.

23         Q          Okay.

24         A          And they said, okay, you go up to 3 -- I

25   think it was 350, 351 cell I was assigned and after I put

1   all my stuff in there and everything, I got me some request

2   slips from the request slip box in the front of the block

3   and I wrote Mr. Keller -- I mean Mr. Buzminsky and Mr.

4   Keller a request slip.  I reminded Mr. Buzminsky of the

5   conversation that we had on D Block and what transpired and

6   I also wrote a request slip to the unit manager Joel Keller

7   informing him of what happened with me and Buzminsky in

8   that inmate reception committee and I told them that I felt

9   as though a transfer was imminent due to what transpired

10  between me and this institution.

11          Q        And what did they tell you?

12          A        They never answered the request slips, so I

13  saw him the next day and I reminded him, listen, I put the

14  request slips in to you, you know do you all plan on

15  answering them.

16          Q        And when you met again with Mr. Buzminsky,

17  did he ever say anything again to you about the transfer?

18          A        On the record or off the record?

19          Q        On the record.

20          A        Well, they don't talk on the record.  They

21  make statements to you, but they don't put it on the

22  record.  I'll tell you what he said to me.

23          Q        Okay.

24          A        He said your situation is being reviewed.

25          Q        Okay.

17

```
1        A        Submit another request slip.

2        Q        Okay.  And did you?

3        A        Of course.

4        Q        And what happened to that?

5        A        They never answered them.

6        Q        Paragraph 29, we jumped ahead a little bit

7   here, you say that you requested -- and I think you're

8   referring to Exhibit C -- we can flip to that, too, a

9   request -- requesting a transfer for fear of his well-being

10  or being set up if he remains in this institution?

11       A        Yes, ma'am.

12       Q        We're looking at Exhibit C.

13       A        I see it, yes, ma'am.

14       Q        What did you mean -- well, explain to me how

15  you were in fear for your well-being?

16       A        Okay.  When I came in this institution April

17  2nd, 1986, okay, Huntingdon has a history of abuse.  It's

18  very well documented there's abuse in this institution.

19  And they have no problem retaliating against inmates,

20  especially one that's allegedly accused of assaulting an

21  officer.

22       Q        And who are these people that --

23       A        Officer Hoover is one of them.

24       Q        He is known for abuse?

25       A        No, no, he's the one that confronted me.  I
```

18

1    had a conversation with Officer Hoover.

2        Q        Well, you said --

3        A        They're known for abusing inmates.

4        Q        Who is known for abusing inmates?

5        A        There's a lot of them.

6        Q        Can you tell me who?

7        A        No, there's a lot of them though.

8        Q        You don't know who?

9        A        There's a lot of them.  You asked me the

10   question why I feared for my life, I explained to you that

11   this institution has a history of retaliating against

12   inmates, especially those that are accused of allegedly

13   assaulting a correctional officer.

14       Q        Okay.  You also say that you are in fear of

15   well-being or being set up if he remained in the

16   institution?

17       A        Yes, ma'am.

18       Q        What did you mean by being set up?

19       A        Retaliatory misconducts, they can vary.

20   They can vary from a conversation that you have with an

21   officer that did not really exist, they can go in your cell

22   and find things that did not really exist.  See, they can

23   write you up for disobeying orders that never was issued

24   and like this retaliatory misconduct that I received, the

25   29th, the allegedly -- my female visitor allegedly placed

1    her hand in my crotch area when I was ten feet in front of

2    the camera and they refused to pull the video from the

3    camera.

4          Q       We'll get to this.  We'll go one at a time.

5    We'll get there.

6          A       Okay.

7          Q       And you filed your Exhibit C.   —

8          A       Yes, ma'am.

9          Q       And did you receive a response to that?

10         A       No.

11         Q       Paragraph 30, you say that on May 23rd you

12    sent another request slip to Buzminsky, Franks,

13    Commissioner Horn and filed an officer grievance with Ms.

14    Baney?

15         A       Yes, ma'am.

16         Q       Now, you're referring there to racial

17    remarks of Officer Hoover.

18         A       Yes, ma'am.

19         Q       Can you tell me what happened there?

20         A       Well, I was on E Block.  I was going to

21    breakfast, Officer Hoover stopped me between the corridor

22    between E Block and A Block.  There's a corridor that links

23    those two blocks together.  Officer Hoover approached me,

24    he said Riley come here.  He said they should not have

25    brought your dumb ass back here.  He said that's what's

20

1    wrong with your stupid ass niggers, I'm going to get you if

2    that's the last thing that I do.

3        Q        So Officer Hoover threatened you, is that

4    what you're saying?

5        A        Yes, ma'am, verbally, yes, ma'am.

6        Q        Okay.  Did you receive a response from

7    Commissioner Horn regarding this?

8        A        No, no, from none of them.

9        Q        No one responded?

10       A        No, ma'am.

11       Q        In Paragraph 31, this deals now with the May

12   misconduct.  Can you tell me what happened?

13       A        Okay.  My stepfather came to visit, brought

14   a female friend of mine named Nina Laten and my stepfather

15   was seated on my right side, Nina was sitting between me

16   and him and I was sitting on the end.

17                The female bathroom door was right in front

18   of us, okay, the booth where the guard sits at is some 15

19   feet away, down toward the machines where the visitors get

20   their concessions at and the camera is right there and the

21   door is right there.

22                Officer Hoover said he seen Nina reach over

23   with her right hand and place her hand down in my crotch

24   area, all right.  He said he got up and came over -- excuse

25   me, I made a mistake.  He said he came over by the bathroom

1    door and he observed her hand down in my crotch area and I

2    covered her hand up with my hand and she removed her hand.

3    Then he said that my visits were cancelled.

4         Q         Okay.  And the Exhibit A is a true and

5    correct copy of the exhibit, I mean the misconduct that was

6    issued to you on that day?

7         A         Yes, ma'am.

8         Q         Okay.

9         A         Do you want me to go on?

10         Q         Well, just a minute.  At that same time you

11    also filed a grievance  --

12         A         Yes, ma'am.

13         Q         -- to Ms. Baney telling her about the

14    misconduct and that it was a setup?

15         A         And she never answered it.

16         Q         Okay.  The next thing that happened was your

17    misconduct hearing; is that correct?

18         A         Yes, ma'am.

19         Q         What happened at the misconduct hearing?

20         A         I called Captain Markley as a witness, but I

21    put him on the witness as -- on the sheet as a character

22    witness, and they dismissed it.  The reason I put Captain

23    Markley on there and Tim Launtz is because as soon as I

24    came out of the visiting room, they were -- Captain Markley

25    was in the command center and Tim Launtz was standing out

1    there talking, and I spoke with them.

2            I said, listen, I want you to pull the

3    videotape from the inside visiting room and I also said the

4    same thing to Tim Launtz about this.  I explained to him

5    that this incident did not happen, and that the videotape

6    will vindicate my visitor.  She did not place her hand in

7    my crotch area or anywhere near it and I request that the

8    videotape be reviewed.

9        Q        Okay.  And what happened as a result of your

10   request?

11       A        They never reviewed the tape.

12       Q        Okay.

13       A        They do it constantly.  I have some

14   statements, some signed statements from many inmates to

15   where they wrote them up off the tapes, the very same

16   camera as the one they said that never recorded me.

17       Q        Okay.  Let's go back to your visit a minute.

18       A        Yes, ma'am.

19       Q        I apologize, I forget the --

20       A        Nina Laten.

21       Q        Nina, okay.  The entire visit was -- you were

22   seated at the same place for the entire visit?

23       A        Yes, ma'am.  It was very short.  I think I

24   was there maybe an hour before my visit was cancelled.

25       Q        And you're saying once again you were seated

1  near the bathroom door?

2      A        I was seated right in front of the bathroom

3  door, the female bathroom door -- well, the outside

4  visitor's bathroom door.

5      Q        And you're saying the camera was placed

6  where?

7      A        Ten feet away, right up on the ceiling, ten

8  feet away by the door, in the corner.  I think that's

9  camera one.  I don't know how they have them lined up, but

10  I think it's camera one, from a lot of the misconducts that

11  the other inmates have, it says camera one.

12              It says upon review of the inside visiting

13  camera, camera one, we observed you coming out of the

14  bathroom -- that's what it says on different inmate's

15  misconducts, that no officer personally observed them

16  coming out of there, but the camera did, upon review, they

17  normally review the videotapes in the visiting room after

18  the visits.  Sometime after the visits, they review the

19  tapes and the next day they write you up or the day after

20  that.

21      Q        Were you seated facing the camera?

22      A        Yes, ma'am.  I was seated here and the

23  camera was facing in this direction, just like that.

24      Q        And the camera had a view of what, the

25  female bathroom door or the male --

24

1       A          No, the camera, the way they got it lined

2  up, it can review everything in that section, see, not just

3  the bathroom door.  It can see everything in that area.

4       Q          Okay.  So on June 2nd as you note in

5  Paragraph 33, you had a hearing for the misconduct?

6       A          Yes, ma'am.

7       Q          And the hearing examiner was -- do you

8  remember who the hearing examiner was?  It's right in

9  Paragraph 33, you identify --

10      A          I was trying to remember his name, 33, yes,

11  Stidd, S-t-i-d-d.

12      Q          What did you do at the hearing, what did you

13  say to the examiner?

14      A          Well, I submitted my inmate version first,

15  and I asked him to call in my witnesses, Captain Markley

16  and unit manager Tim Launtz.  He said these two witnesses

17  will be dismissed because you got them down here as

18  character witnesses and no character witnesses are allowed

19  to testify in the hearing.

20           I said, fine.  He said I noticed in your

21  version that you requested that I review the videotape.  He

22  said I'm not going to review the videotape.  This is in his

23  version.  He said I'm not going to review the tape.  He

24  said I'm going to dismiss the category B4 engaging in

25  sexual acts with others or sodomy, because I don't believe

1    it was a sexual act.

2             He said, however, I'm going to find you

3    guilty of the category class 1D 25 violation of visiting

4    room privilege.

5        Q        Okay.  As a result of that you were

6    sanctioned to what?

7        A        Well, they dismissed the time -- the cell

8    restriction time, they dismissed it and they gave me a

9    class 2 number 35, which means any violation in the inmate

10   handbook not a class 1.

11            There's five of them in the inmate handbook

12   that's not class 1.  One is horseplaying; two is body

13   punching; three is being late for work; four is smoking in

14   an unauthorized area; and five is possession of contraband

15   that's not a class 1, then it's the number 35, which means

16   that it's the catchall.

17       Q        And did you appeal this misconduct?

18       A        Yes, ma'am.

19       Q        Let's take the first level.  It says here on

20   Paragraph 35, you appealed the charges to the prison review

21   committee and what happened with them?

22       A        They are the ones that broke the misconduct

23   down, they broke it down from a class 1 number 25 to a

24   class 2 number 35.

25       Q        Okay.

1    A        They state in their version that I asked to
2    review the videotape.  They said this incident wasn't an
3    incident that was caught on tape, see, so they did review
4    it, it just didn't show anything that the officer said
5    happened.

6    Q        Okay.  Paragraph 36, you then say that the
7    Pennsylvania Board of Probation and Parole suspended your
8    parole?

9    A        Yes, ma'am.

10   Q        And you state there due to the bogus
11   misconduct received from Officer Hoover.  And just one more
12   time, explain to me why you believe it's a bogus
13   misconduct?

14   A        Because the incident never happened, and the
15   videotape stated that, it showed that it never happened.

16   Q        Okay.  Now, you state in Paragraph 37 that
17   you filed an appeal for administrative relief from the
18   Pennsylvania Board of Probation and Parole?

19   A        Yes, ma'am.

20   Q        What happened there?

21   A        The first one they never answered.

22   Q        Okay.

23   A        So I filed a motion for adjudication to
24   compel them to comply with my first motion.  By that time I
25   submitted that motion to adjudicate, they had suspended --

1    they had took it away.

2         Q        Okay.

3         A        They have rescinded it.

4         Q        So by the time you filed your motion for

5    adjudication, your parole was already suspended?

6         A        Rescinded.

7         Q        Okay.

8         A        Then I filed another motion, you know,

9    behind the rescission.

10        Q        Just one step backwards to the misconduct

11   issued in May of 1999 after you appealed it to the program

12   review committee.  Did you appeal it any further than the

13   program review committee or the prison review committee?

14        A        Say that again.

15        Q        Did you appeal the misconduct to the next

16   step after the program review committee?

17        A        No.

18        Q        Okay.  Paragraph 38, you say that in August

19   you were staffed again for parole  --

20        A        Yes.

21        Q        -- by unit manager Keller, Buzminsky,

22   Kaughman, what do you mean by that?

23        A        E Block, they staff you for parole.  What

24   they do is they'll call you up to the office, and they'll

25   review your file to see whether the institution is going to

1    recommend you for parole or not.

2            Q          Okay.

3            A          And they'll ask you a few questions about

4    what happened in your case, what programs you completed, do

5    you have any misconducts and what is the nature of why you

6    have misconducts.

7            Q          Okay.  You have in Paragraph 39 that you

8    sent a request slip to your new counselor Ms. Holderman and

9    you informed her of the situation with Officer Hoover and

10   your efforts to secure transfer?

11           A          Yes, ma'am.

12           Q          What did you tell Ms. Holderman?

13           A          Well, it's attached.

14           Q          I didn't see a reference to that.

15           A          Okay.  Basically what I said to Ms.

16   Holderman was I was requesting a transfer.

17           Q          Okay.  And did you tell her why?

18           A          Yes, considering the things that had

19   transpired, I felt as though it would be in my best

20   interest.

21           Q          And did you get a response from her?

22           A          No, ma'am.

23           Q          Okay.  What did you do after that concerning

24   your transfer?

25           A          After Ms. Holderman?

---

Q Yes. Did you contact anyone else again?

A Oh, sure.

Q Who was that?

A I contacted the unit manager.

Q Who would that be?

A At that time I think it was -- I can't think of his name. Wait a minute. I'll find it.

Q Why don't you look at Paragraph 40 and see if that helps you a little bit there?

A Yes, Kurt, K-u-r-t G-r-a-n-d-l-u-n-d, Grandlund.

Q And did he respond to you at all?

A No, ma'am.

Q Okay. What did you do after you sent the request slip to Mr. Grandlund concerning the transfer?

A That's the rescission of my parole date.

Q No, after you sent the request slip to the unit manager and he didn't respond, did you contact anybody else at that time?

A Not that I recall, no.

Q Okay. And then I see in Paragraph 41 that you allege that your parole was rescinded, correct?

A Yes.

Q In December?

A Yes, ma'am.

GEIGER & LORIA REPORTING SERVICE, 2408 PARK DR., SUITE B, HBG., PA 17110  717-541-1508 OR 1-800-222-4577

1      Q          Then what did you do once you got notice of
2   the parole being rescinded?
3      A          I filed an appeal to it.
4      Q          Okay.  And who did you file the appeal with?
5      A          Excuse me, I issued -- I put in a request
6   slip to Tim Launtz, unit manager.  Back up, where Kurt
7   Grandlund is, I put in a request slip to Tim Launtz.
8      Q          Okay.
9      A          I apprised him of the same situation.
10     Q          In Paragraph 42 you said that you filed a
11  motion for adjudication to compel the parole board?
12     A          Yes.
13     Q          Who did you file this with?
14     A          The Pennsylvania Parole Board in Harrisburg.
15     Q          Did you get a decision from them, a written
16  decision?
17     A          No.
18     Q          You never got a decision from them?
19     A          No, what they did was they replied to my
20  motion pertaining to the rescission of my parole.  They
21  replied to that.
22     Q          What did they tell you?
23     A          They told me I didn't have a right to
24  parole.
25     Q          Okay.  Paragraph 45, you state that your

1     transfer to SCI Huntingdon from SCI Pittsburgh, your

2     custody level 2 security level inside and outside the

3     prison is the lowest an inmate can maintain in the state

4     prison system.  You believe that to be correct?

5          A       Yes.

6          Q       Maybe you can explain to me what you mean by

7     this transfer here where you should have been transferred

8     to what level?

9          A       All right.

10         Q       Can you clear that up for me a little bit?

11         A       What I'm talking about is, custody level 2,

12    all right.  Most custody level 2s are transferred to

13    custody level 2 institutions.  Considering the fact that I

14    was in Pittsburgh, SCI Pittsburgh, which is a custody level

15    4 institution, I was informed of the fact that because I

16    was a custody level 2 awaiting parole release to the

17    community corrections center that they could no longer --

18    no, they said the Department of Corrections has a new

19    policy.  They try to transfer inmates with those custody

20    levels to institutions that reflect that level.

21         Q       Who told you about this public policy?

22         A       Oh, my counselor.

23         Q       And your counselor was?

24         A       Nars M. Collins.

25         Q       Is that C-o-l-l-i-n-s?

1       A       Yes, ma'am.

2       Q       Okay.  He told you once again that -- tell

3   me again.  He told you what?

4       A       The DOC had a policy because I asked him why

5   was I being transferred from Pittsburgh, considering the

6   fact I had a parole release date to.  He said, well, the

7   DOC has come up with this policy to where they try to

8   transfer custody level inmates to institutions that reflect

9   their status.

10      Q       Okay.

11      A       Which I was a 2, so they try to get them in

12  custody level 2 institutions, because I had requested to

13  stay in Pittsburgh.

14      Q       Okay.  So what you're telling me, what

15  you're saying in that paragraph, you're saying --

16      A       Well, I'll read the paragraph.

17      Q       Okay.

18      A       Paragraph 45, before, during, after and to

19  date plaintiff's transfer to SCI Huntingdon from SCI

20  Pittsburgh, his custody level 2 security level within the

21  institution and outside the institution is the lowest an

22  inmate can attain in the state prison system.  Plaintiff

23  being a security level 2 should have been transferred to a

24  security level 2 institution and not a security level 4

25  institution like SCI Huntingdon considering the fact that

1    plaintiff was awaiting parole release to the community

2    correction center November 22nd, 1999 and that there is a

3    separation between plaintiff and the institution.

4         Q         Okay.  So you're saying that you should not

5    have been transferred to Huntingdon because of your custody

6    level?

7         A         No, ma'am.  I'm saying I should not have

8    been transferred to Huntingdon because of the custody level

9    and the active separation documentation between me and this

10   institution and the fact that I was fearing for retaliation

11   by the institution or the administration in the

12   institution.  That's what I'm saying.

13        Q         All right.  Can we take a minute here?

14                  (Brief pause.)

15   BY MS. LEWIS:

16        Q         Mr. Riley, in your complaint, you named a

17   number of defendants.  What I would like to do is go

18   through the defendants one by one and have you tell me

19   exactly what these defendants did to violate your

20   constitutional rights.  The first one is Martin Horn.  What

21   exactly did Martin Horn do?

22        A         In addition to not answering the letter I

23   sent to him, he's in charge of the Department of

24   Corrections, he sets policies and procedures for all

25   institutions in the State of Pennsylvania.

```
 1        Q        And that's how he violated your rights?
 2        A        He's personally responsible for their
 3  actions.
 4        Q        Okay.  Other than the letter that you wrote,
 5  did you have any other contact with Mr. Horn?
 6        A        Other than discovery?
 7        Q        Yes.
 8        A        No.
 9        Q        You also name Superintendent Frank?
10        A        Yes, ma'am.
11        Q        What did Superintendent Frank do?
12        A        He's in charge of the administration at SCI
13  Huntingdon.
14        Q        Okay.
15        A        He's in charge of all the officers and their
16  actions within this institution.
17        Q        Okay.
18        A        And in addition to him not answering my
19  request slips.
20        Q        Is there anything else that Superintendent
21  Frank did?
22        A        In addition to not answering my request
23  slips and being in charge of all the officers in his
24  administration?
25        Q        Right.
```

1          A          No.

2          Q          What about Superintendent Myers, what did he

3     do to violate your constitutional rights?

4          A          Well, he is in charge of the

5     administration -- at the time he was in charge of the

6     administrative aspect of the administration here in

7     Huntingdon.

8          Q          Okay.

9          A          And in addition to him sitting on the PRC,

10    he was one of the individuals that reviewed the misconduct

11    and in charge of administration he's responsible for those

12    officers, you know, underneath him.

13         Q          Is there anything else that Mr. Myers did?

14         A          I don't understand your question.  Other

15    than what I just said?

16         Q          Yes.

17         A          No.

18         Q          What about Mr. Grace?

19         A          Security captain -- excuse me, Major Grace,

20    Major Grace is in charge of the officers.

21         Q          Okay.

22         A          And as such, he's responsible for their

23    actions, he sets policies and procedures pertaining to

24    their actions inside this institution.

25         Q          There's nothing else that he did other than

1    that?

2         A         No.

3         Q         Okay.  How about Ms. Baney?

4         A         She refused -- she's the hearing examiner --

5    excuse me, she's the grievance coordinator, okay.  I

6    brought my complaints to her attention of which she refused

7    to comply.

8         Q         And after she, as you allege, refused to

9    comply, did you take that matter any further?  Did you

10   complain to anybody about Ms. Baney's actions or inactions?

11        A         Yes, I stuck her in my complaint.

12        Q         Okay.  This civil rights complaint?

13        A         Yes, ma'am.

14        Q         But other than a civil rights complaint?

15        A         I took her to the justice department as

16   well.

17        Q         Okay.  Hearing Examiner Stidd.  Now, we

18   talked a little bit about him.  Can you tell me what he did

19   to violate your constitutional rights?

20        A         Well, he arbitrarily denied me or denied

21   pertinent evidence that could prove my innocence which was

22   the videotape.  In addition to that, he didn't follow

23   policies in the inmate handbook, because the inmate

24   handbook says that a class 1D 25 violation of visiting room

25   privileges must be substantiated.  When he dismissed the

1    class 1B 4 engaging in sexual acts or others with sodomy,

2    he dismissed the charge that allegedly substantiated the

3    second one.

4         Q        Okay.  Is there anything else other than

5    than the relation to the misconduct and his duties as

6    hearing examiner, anything else that Stidd --

7         A        No, ma'am.

8         Q        Okay.  You name the unit manager Tim

9    L-a-u-n-t-z?

10        A        Tim Launtz, yes, ma'am.

11        Q        Can you tell me how he violated your

12   constitutional rights?

13        A        I brought the matter to his attention and he

14   did nothing to straighten that matter out.  I talked to Tim

15   about that and I requested him that him and Captain Markley

16   pull that videotape, because if the day -- they last a day

17   or two afterwards, they're going to erase it.  I was fully

18   aware of that and I vehemently stressed that fact to them,

19   pull that tape now or review the tape now before it's

20   erased, so he refused to review pertinent evidence in my

21   case that would prove my innocence pertaining to this

22   matter.

23        Q        After you talked to Mr. Launtz, other than

24   filing this lawsuit, did you file any grievance

25   concerning --

1          A          Against Mr. Launtz?

2          Q          Yes.

3          A          No, ma'am.

4          Q          You also name unit manager Joel Keller?

5          A          Yes, ma'am.

6          Q          Can you tell me what Mr. Keller did to

7    violate your constitutional rights?

8          A          In addition to not answering my request

9    slips, and not heeding the conversation with Counselor

10   Buzminsky about me not being admitted back into this

11   institution?

12         Q          Right.

13         A          He done absolutely nothing to alleviate what

14   was going on and what was happening to me in this

15   institution.  He did absolutely nothing.

16         Q          Okay.  Other than filing the grievance that

17   you said was not responded to  --

18         A          Yes, ma'am.

19         Q          -- did you file any additional --

20         A          A grievance on the unit manager?

21         Q          Yes.

22         A          No, ma'am.

23         Q          You also name Counselor Buzminsky?

24         A          Yes, ma'am.

25         Q          What did he do to violate your

1   constitutional rights?

2        A        Other than not documenting the fact that we

3   had this conversation in the inmate review committee, he

4   never answered any of my request slips.

5        Q        Okay.

6        A        And he done nothing to alleviate my

7   situation here in SCI Huntingdon, he did not put in for a

8   transfer, he did not represent me or assist me in any kind

9   of way pertaining to my situation here.

10       Q        Okay.  That's all Buzminsky did?

11       A        That's all he did?

12       Q        Anything additional?

13       A        No.

14       Q        You also name Correctional Officer Hoover.

15   Can you tell me how he violated your constitutional rights?

16       A        Yes, the racial comment that he made, that

17   violated my constitutional right, the threat, the

18   retaliatory action.

19       Q        I'm looking for the paragraph here, I

20   apologize, where you were talking about being set up.

21       A        That's retaliatory action.

22       Q        Why would Officer Hoover retaliate against

23   you, what would his reason be?

24       A        Allegedly assaulting a co-officer.

25       Q        Okay.  Is there anything else about Officer

1    Hoover that you would like to add?

2         A          In addition to what I have in my complaint?

3         Q          Yes.

4         A          No, ma'am.

5         Q          Okay.  You also name Corrections Officer

6    McFadden?

7         A          Yes, ma'am.

8         Q          How did she violate your constitutional

9    rights?

10        A          Well, I added Officer McFadden to my

11   complaint to explain how I got in the situation I'm in now

12   or the separation documentation was placed on me.  I

13   understand that in that particular misconduct or situation,

14   the statute of limitations on that ran out.  So I included

15   her to explain how the separation documentation was placed

16   upon me.

17        Q          Well, if the only reason that you included

18   her was to explain --

19        A          Yes, ma'am.

20        Q          -- would you consider withdrawing her as a

21   defendant?

22        A          Would I?

23        Q          Yes.

24        A          Yes, ma'am.

25        Q          Okay.  So we can agree that Officer McFadden

1    is no longer a defendant in this case?

2        A        Well, I won't say that.  What I'll say is,

3    the reason why I put Officer McFadden in my complaint is

4    because of the situation that happened in 1993.

5        Q        Right.

6        A        I am aware of the fact that the statute of

7    limitations on that misconduct ran out.

8        Q        So I just want to explain to you that

9    because the statute has run, you don't have a claim against

10   Ms. McFadden, correct?

11       A        It would appear that way.

12       Q        Okay.  And so you will agree then to --

13       A        No, no.

14       Q        Okay.  Okay.  You will not agree to?

15       A        No, no.

16       Q        You also name Mr. Bell in the caption of

17   your complaint?

18       A        Can you tell me how Mr. Bell has violated

19   your constitutional rights?

20       A        I was under the impression that he was in

21   charge of transfers.

22       Q        Okay.

23       A        And he reviewed -- in discovery I found out

24   that he's not in charge of transfers.

25       Q        Okay.

42

```
1          A        So since he doesn't hold that position as I

2   first thought, I'll explain why I stuck him in my

3   complaint.  I stuck him in there, like I said, because I

4   thought he was in charge of transfers, and he sent me back

5   to this institution knowing that the separation

6   documentation in my file against this jail.

7          Q        Okay.  Would you agree to drop then --

8          A        No.

9          Q        Chairman Word, I think it's a typo, Ward,

10  W-a-r-d?

11         A        Yes, ma'am.

12         Q        How did he violate your constitutional

13  rights?

14         A        He's in charge of the Pennsylvania Board of

15  Probation and Parole.  He reviews all the decisions that's

16  made.

17         Q        And what did he personally do in this case?

18         A        By reviewing the files, he was aware of the

19  fact that I was sent back to an institution that has a

20  separation documentation placed on me.

21                  Number two, when they reviewed me here in

22  this institution sent, I brought it to the interviewer's

23  attention, listen, I was never supposed to be sent back to

24  this institution, you all gave me a five-year hit where I

25  received five one-year hits as a result of this alleged
```

1    assault in 1993.

2            You all know I wasn't supposed to be sent

3    back to this institution, but yet you're all reviewing me

4    here and you're offering no assistance as to my current

5    situation, being as though he's the chairman he is in

6    charge of them.  He reviews their decisions and he did

7    nothing.

8        Q        Mr. Riley, we talked a little bit about the

9    custody levels of the institutions.  At SCI Greene where

10   you said you were to be transferred to, are you aware of

11   any custody level twos at SCI Greene?

12       A        Yes, ma'am.

13       Q        How about threes?

14       A        Custody 3 are kept in F unit.  It's out --

15   it sits up on a hill.  It's  -- they're outlined clearance

16   unit.

17       Q        Would you also agree there's custody level

18   3, 4 and even custody level 5 inmates at Greene?

19       A        Well, I'll read what the transfer order

20   says.  It says, "This inmate has been accepted as a parolee

21   in the community correction center with the acceptance date

22   of more than three months into the future.

23            "If he is not a problematic prerelease case

24   and if institution staff recommended parole, arrangements

25   should be made in accordance with the established

```
 1    procedures for transfer to SCI Greene for placement in
 2    outside unit.  Staff at SCI Greene should make adequate
 3    transportation arrangements in order to assure that this
 4    individual will arrive at the community corrections center
 5    on the acceptance date."
 6         Q         Thank you.
 7         A         Yes, ma'am.
 8         Q         Mr. Riley, are you aware that there are
 9    custody level 2 inmates at Huntingdon?  Let me rephrase
10    that.  Do you know of any custody level 2 inmates at SCI
11    Huntingdon?
12         A         With separation documentations in their file
13    against the institution?
14         Q         We can do --
15         A         No.
16         Q         What about without separation documentation?
17         A         Yes, but they haven't been kicked out of
18    here for allegedly assaulting guards.
19         Q         Are you aware that there are outside units
20    at SCI Huntingdon?
21         A         Yes, ma'am, I'm aware of the fact there's no
22    custody level 2 outside of the unit that was allegedly
23    kicked out for assaulting a guard.
24         Q         What is your parole status?
25         A         I max out next year.
```

```
1        Q        Do you know when your next parole review is?

2        A        I think in June or July.

3        Q        Okay.  So you max in '01?

4        A        2002.

5        Q        That's right, it is '01.

6        A        Yes, ma'am.

7        Q        So you have a parole hearing, your next

8   parole review is June.  Do you know when in '01?

9        A        No, ma'am, sometime in June or July, it says

10  on or about.

11       Q        Okay.  And your last parole review was when?

12       A        September.

13       Q        Of?

14       A        Last year.

15       Q        Okay, 2000.  And I'm gathering what happened

16  at that review?

17       A        They asked me what happened in my case, what

18  was the programs that I completed, and they didn't have a

19  clue as to what institution I came from.

20       Q        Okay.  Was your parole granted or denied?

21       A        It was denied.

22       Q        Do you know why it was denied?

23       A        It just said the administration of justice

24  cannot be achieved by your release on parole.  You,

25  therefore, are denied.
```

1    Q        After the May 1999 misconduct  --

2    A        Yes, ma'am.

3    Q        -- did you receive any other misconducts?

4    A        Yes, I received a retaliatory misconduct in

5  August, the first week of August 1999, it was during the

6  major shakedown after Inmate Thomas, Thompson escaped from

7  the jail.

8    Q        Okay.

9    A        When I came to the institution May 12th,

10  1999, I was on D Block and the search and strip down team

11  went through my two boxes that I brought from Pittsburgh.

12  In addition to that they had a property sheet, on that

13  sheet states everything that came with you.

14            Inside my box was a card from a friend of

15  mine that had a religious coin attached to it.  The search

16  and shakedown team observed it and said, listen, it's not

17  currency, it's a religious coin.  They let me have it.  And

18  during that shakedown, the guard wrote me up for having

19  currency.  I told him that's not currency.  I said it's a

20  religious coin.  I showed him the property slip and he

21  wrote me up anyway.

22    Q        Okay.

23    A        So I go to the hearing examiner and I tell

24  him, listen, here's the property slip and this is a

25  religious coin.  This is not currency.  He states that it's

1    no currency that he's familiar with, however, it must be

2    currency, therefore, you're guilty of possession of some

3    currency.  So what I did was I appealed it and I explained

4    to the PRC what happened, this is the document response

5    from the PRC stating, you know.

6         Q        So it was, that misconduct was dismissed?

7         A        But my point being is, it should never have

8    occurred in the first place considering the fact that the

9    document, the packing sheet came with me.  I was allowed to

10   bring it in the institution May 12th, 1999, therefore, I

11   should have never been wrote up and the only reason that I

12   was wrote up is in retaliation, because the documentation

13   stated clearly that this is a religious coin, and that it

14   came from -- with me from SCI Pittsburgh to SCI Huntingdon.

15        Q        Okay.  Any other misconducts?

16        A        No, ma'am.

17                 MS. LEWIS:  One minute, again.

18                 (Brief pause.)

19   BY MS. LEWIS:

20        Q        Mr. Riley, in Section 5 of your complaint

21   there's something that's captioned legal claims?

22        A        Yes, ma'am.

23        Q        Maybe you can tell me a little more about

24   these legal claims?

25        A        Like what?  What would you like to know?

48

```
1        Q        Just going through them, give me a minute
2    here.  Paragraph 57.
3        A        Fifty-seven, yes, ma'am.
4        Q        You talk about racial discrimination.
5        A        I'll read 57 and then I'll answer it.
6    "Plaintiff avers that defendants were deliberately
7    indifferent to a pattern of racial discrimination,
8    harassment and a reign of terror which violated plaintiffs
9    liberty, interest and protection from this type of torture.
10   To date, blacks and whites eat on separate sides of the
11   dining room at SCI Huntingdon as a direct result of this
12   racist policy and violation of his 1st and 14th Amendment
13   to the U.S. Constitution."
14               Now, I'll address the racial thing that you
15   asked me about.  One, the pattern of racial discrimination
16   is as a result of racial remarks of Defendant Hoover in his
17   statement to plaintiff 5/23/1999 and the unit manager
18   Keller's actions as the unit manager of F Block and the
19   situation with the eating facilities in the dining hall.
20       Q        Let me back you up a minute.
21       A        Yes, ma'am.
22       Q        Do blacks and white eat at separate sides of
23   the dining room at Huntingdon?
24       A        Basically.
25       Q        Basically?
```

1    A       Blacks eat on the left side, whites eat on

2  the right side and the ones that want to mix, I assume, eat

3  in the middle.

4    Q       And who designates the seating arrangement?

5    A       That mentality is from old days, when it

6  was, you know, pushed that you sit that way.

7    Q       And who pushed --

8    A       I would imagine the administration, from the

9  '70s, you know, it was still in effect when I was here in

10 1980.

11   Q       Is there a written policy on this, is there

12 policy on this?

13   A       No, ma'am.

14   Q       Directive?

15   A       No.  Number 2, I'll address that reign of

16 terror.  The reign of terror is all of the retaliatory

17 actions taken against plaintiff by the Huntingdon

18 administration.  One, the two retaliatory misconducts; two,

19 the refusal to correct the revocation of plaintiff's

20 prerelease status; three, the altering of plaintiff's

21 prescriptive program plan.  That constitutes the reign of

22 terror.

23   Q       Mr. Riley, tell me what leads you to believe

24 that your prescriptive program was altered?

25   A       The document itself shows me that it was

1   altered.

2        Q       How was it altered?

3        A       Okay. Are you ready?

4        Q       Yes.

5        A       On 11/17/99, I was issued a prescriptive

6   program plan from my counselor, Ms. Holderman.  If you will

7   notice on line 6 there is nothing on that plan, it's blank,

8   okay.  Then if you'll look down at the bottom of that same

9   sheet, you'll see there's nothing, it's blank.

10             Now, I just had a review, okay, 11/21/2000,

11   there was another review done on me, okay.  Attached to

12   that prescriptive program sheet of 11/21/2000 was an old

13   sheet from 11/17/99, which she had.  See, I have a copy and

14   she has a copy.

15             On her copy -- that is a copy of my copy --

16   there's a 6, line 6.  In mine, the original one, which I

17   took with me, there is no line 6, but on the copy that she

18   attached to the 2000 review, there's a line 6.  And then if

19   you look down at the bottom, you'll see that there's 1, 2,

20   3, 4, 5, 6 lines.  On the original, there is none.

21             Now, in that same document 11/17/99, there's

22   two signatures of mine.  When this document was issued to

23   me in 1999, she said sign the bottom of it, so I signed the

24   bottom of the sheet.  Then she said, not that spot, up

25   here, so I signed it a second time.  That's how my

1    signature appeared on that document twice where the bottom

2    part there is no writing, but my signature is still there.

3         Q        Mr. Riley, can I see those a minute?

4         A        Yes, you may.

5         Q        Thank you.

6         A        That's the original, there is no line 6 and

7    there's nothing at the bottom, nothing at all.  Now, look

8    at this 11/17/99, these are the same documents, this is

9    mine and this is hers.

10        Q        Is it possible that -- we see some etching

11   here? Look down on her document and see if the etching you

12   see matches anything on the bottom?  Does it match anything

13   down there.  I gather and I am just by viewing this that

14   this information here, the date is 11/21?

15        A        But I wasn't present when that was filled

16   out.  I wasn't present.  When this was done, I wasn't

17   present, see.  They held this without me.  I was not

18   present.  I was present for this one.

19        Q        But because that's the results --

20        A        And I was not present for this.  All this

21   stuff she wrote down here was not in my presence.

22        Q        Okay.

23        A        Now, this 6 she added on this, was not what

24   I agreed to when I signed this document.  There is no 6,

25   had she stuck something in that line 6, I would never have

1   initially signed that document.  So she left it blank and

2   then she added something later on or I would have never

3   signed it.

4        Q        Clearly this bottom half was filled out at a

5   later date?

6        A        And I was not present, I explained how the

7   two signatures got on here.

8        Q        I understand.

9        A        All right.

10       Q        If there's a 6 here on this sheet, but it's

11  blank on yours --

12       A        My sheet is the original, when you do a

13  prescriptive program plan, look at the bottom, it will show

14  you, there's attachments.

15       Q        Right, right.

16       A        You see those attachments, they tell you in

17  color codes, look at the bottom.  It tells you the color

18  codes of the sheets that are attached to the one package.

19  When you leave from the prescriptive program plan, you take

20  one with you, and the one I took with me, has nothing in

21  the line 6.

22       Q        Right.  That we can see now.

23       A        Yes.

24       Q        But why would you sign it then?

25       A        I explained to you how those two signatures

1   got on there.  I'll explain it again.

2        Q        Even with a blank 6?

3        A        Let me explain to you how they got on there.

4   When the documents were together, okay, there's a white, a

5   yellow, a pink and a goldenrod.  They're all attached

6   together.  She filled the top part out and this part.  She

7   handed me the document and said sign the bottom.  Normally

8   when someone tells you to sign the bottom of the piece of

9   paper, what does it mean?  It means the bottom, so I signed

10  the bottom.

11           Then she looked at it and said, no, not

12  there, sign it up here.  She didn't say sign in the middle

13  of the page, she said sign the bottom.  That's how both of

14  my signatures got there.  I signed the document twice.  And

15  where she has that date put on there down there on that

16  other document, I was not present when that was filled out.

17       Q        Was the number 6 there originally when you

18  signed?

19       A        No, there was no 6 originally or I would

20  have never signed it, had she put that 6 in there, wrote 6

21  and wrote behind 6 what she wrote behind it, I would never

22  have signed it.  If you're asking me if the number 6 was

23  there, yes.  What's behind the number 6 was not on there.

24       Q        You signed something with a 6 and it was

25  blank?

1      A        Yes, ma'am.

2      Q        Well, I think the document speaks for

3   itself.  Give me a minute here.  We have a lot of

4   paragraphs here, Mr. Riley.

5                (Brief pause.)

6   BY MS. LEWIS:

7      Q        Paragraph 56 you say you were in a

8   vulnerable position?

9      A        Yes, ma'am.

10      Q        But nonetheless, deliberately or maliciously

11   and intentionally failed to do anything to alleviate the

12   violation of the 8th and 14th amendments.  Can you tell me

13   in addition to what you already have put on the record,

14   what the defendants did that intentionally failed to

15   alleviate these violations, maybe you can tell me first

16   what the violations were?

17      A        Cruel and unusual punishment.

18      Q        How?

19      A        Cruel and unusual?

20      Q        Yes.

21      A        By sending me back to this environment,

22   knowing that I'm labeled as an inmate that assaults

23   correctional officers.  That's cruel and unusual, because

24   that precipitates retaliatory action by any staff member,

25   as soon as they look on this, oh, he likes to assault

1    guards.

2         Q        You also state in Paragraph 55 that

3    defendants recklessly and with gross negligence failed to

4    adequately train and supervise its employees.  Can you tell

5    me how?

6         A        All of their behaviors.

7         Q        Any specific behavior?

8         A        I stated that in my rebuttal and in my

9    complaints.  Do you want me to go to those sections and

10    read them?

11         Q        They're complete in your rebuttal?

12         A        Oh, yes.  Okay.  I stated that in paragraph

13    6.

14         Q        Is this of your rebuttal?

15         A        Yes, ma'am.  Plaintiff asserts that, one,

16    the municipal policymakers Department of Corrections,

17    Pennsylvania Board of Probation and Parole and SCI

18    Huntingdon administration note to a moral certainty that

19    employees will confront the kinds of situation in which an

20    inmate is accused of assaulting or allegedly assaulting a

21    fellow officer/staff.

22         Two, the institution  -- the situation

23    involves a difficult choice because the employees have to

24    refrain from allowing his or her personal feelings or

25    opinion about a situation that involves staff and inmates

56

1    from clouding his or her judgment.

2            And three, the wrong choice by an employee

3    as in the instant case results in threats, racial comments

4    and other forms of retaliation that frequently cause

5    deprivation of constitutional rights.

6        Q        Okay.  So that leads to improper training

7    and supervision, you say that's how they're improperly

8    trained and supervised?

9        A        Yes, ma'am.

10        Q        You also state that you suffered severe

11    mental and emotional anguish due to this torture.  Can you

12    tell me what your severe mental and emotional anguish is?

13        A        Well, I lost my mother as a result of these

14    hits that I've been receiving from the parole board as a

15    result of that alleged situation in 1993.

16        Q        And how did you lose your mother?

17        A        My mother passed away.

18        Q        Okay.

19        A        Had I not received that retaliatory

20    misconduct or that bogus misconduct in 1993, I would have

21    made my parole date, December 23rd, 1993.  In addition to

22    that --

23        Q        This would have prevented your mother from

24    dying?

25        A        No, no, we're talking about -- the question

1    that you asked me, I'm putting all of it together.

2         Q        Okay.

3         A        Yes.

4         Q        You lost your mother?

5         A        Yes.

6         Q        In '93?

7         A        Yes.

8         Q        Because of the misconducts?

9         A        No, the misconduct in '93, my mother passed

10   away in '95.

11        Q        Okay.

12        A        Had I made my parole date in 1993.

13        Q        Okay.

14        A        Had it not been for that bogus misconduct in

15   the trailers, I would have went home on my parole date

16   which was December 23rd, 1993.

17        Q        Okay.

18        A        As a result of that bogus misconduct, in

19   between then, my mother passed away in 1995. Now, being

20   placed in an environment where you're labeled as allegedly

21   assaulting a guard brings a lot of stress with it.

22        Q        Okay.

23        A        In addition to that stress, the misconduct

24   that I received May 29th, 1999, nine misconducts that I

25   received August 1999, the fact that I was processed for

1    release, one day before I was supposed to leave, it was

2    taken away from me.  No one has explained to me at this

3    point why my prerelease status was removed as a result of

4    this class 2 misconduct.

5                    In addition to that, I have filed numerous

6    documents that go unanswered.  That creates a lot of

7    stress, a lot of mental anguish.

8        Q        Can you describe the stress for me?

9        A        Describe the stress to you.  Well, I'm very

10   frustrated.

11       Q        Okay.

12       A        I'm one year from maxing out an 18 year

13   sentence, I feel like the rehabilitation that has taken

14   place in my life has been reversed as a result of me being

15   placed in this detrimental environment, instead of me being

16   rewarded for the gains that I've made in my life.

17                   Skill wise or trade wise, I've trained the

18   painters for the Department of Corrections in Pittsburgh.

19   I have documentation to verify that.  Would you like to

20   see it?

21       Q        Sure.

22       A        This is my resume.  If you'll go to the last

23   three pages in the back, right there, I ran several groups

24   for the Department of Corrections in Pittsburgh as a

25   co-facilitator.  That's a group that I ran in Pittsburgh.

```
1       Q       A letter of recommendation?

2       A       Right there.

3       Q       Okay.  Very good.

4       A       Keep going.

5       Q       About your painting?

6       A       Next one.

7       Q       Referring, again to a letter of

8    accommodation pertaining Mr. Riley's painting.

9       A       That's it.  Additional stress that I'm

10   feeling, in addition to getting my GED in 1986 and the

11   different programs that we've already discussed with me

12   co-facilitating groups in Pittsburgh, I've attained my

13   master's degree and I've attained my doctorate degree.

14              So I have throughout my incarceration

15   seriously tried to, you know, rehabilitate myself and it

16   seems as a result of my efforts to rehabilitate myself,

17   I've been placed in an environment that would reverse

18   everything that I've done.

19              Out of the years that I've been

20   incarcerated, I've been in Camp Hill, no misconducts.  I've

21   been in Pittsburgh, no misconducts.  The eight misconducts

22   that I've received in 16 years and 10 days came from SCI

23   Huntingdon.  I have no misconducts in any other institution

24   in the 16 years and some odd days that I've been

25   incarcerated except SCI Huntingdon.  So I'm very stressed
```

1   out about that.

2        Q         I have a question for you.  You said you've

3   received eight misconducts within 10 days?

4        A         No, eight misconducts in my whole entire

5   incarceration and all eight of them come from SCI

6   Huntingdon.

7        Q         Okay.

8        A.        I was in SCI Pittsburgh for five years,

9   received none.

10       Q         And your emotional anguish, is there

11  anything that distinguishes that from your mental stress?

12       A         My emotional anguish is how I feel as a

13  result of what's been happening to me these 16 years and

14  some odd days.  Everyone says, rehabilitate yourself, get

15  in this program, get in that program, stay misconduct free,

16  do this, do that.  I jumped through every single one of

17  them hoops.

18                 I went above and beyond the call of duty.  I

19  willfully accepted responsibility for my actions and

20  willfully set out to correct and make amends for the things

21  that I've done and as a result they send me to a place that

22  they know will be detrimental, because there's a record of

23  its effect.

24       Q         I have another question here, Paragraph 53,

25  just to make sure we're clear on this one.  You have here

1    in --

2        A        Go ahead.

3        Q        That the defendant refused to answer

4    plaintiff's appeal on July 24th, 1999, motion for

5    adjudication of appeal December 30th, 1999 and appeal for

6    administrative relief filed on January 7th, 2000?

7        A        They answered that one.

8        Q        They answered it?

9        A        January 2000, they answered that.

10       Q        Okay.  And the answer was?

11       A        Refused, you do not have a right to parole.

12       Q        Okay.  Mr. Riley, one other question.  From

13   1993 to 1998 when you received the parole, in that time

14   period between '93 and '98, why weren't you paroled?  Do

15   you know why?

16       A        They kept giving me hits.  They said failure

17   to complete programs, failure to receive the institutional

18   recommendation, continue with programming, basically.

19       Q        So those were the reasons that were found

20   on --

21       A        Stated in their green sheet.

22       Q        Okay.

23              MS. LEWIS:  I think that's it Mr. Riley.  I

24   don't have anything else.

25       A        I have some questions.

GEIGER & LORIA REPORTING SERVICE, 2408 PARK DR., SUITE B, HBG., PA 17110   717-541-1508 OR 1-800-222-4577

62

(The deposition was concluded at 11:42 a.m.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

63

COUNTY OF CLEARFIELD            :
                               :  ss.
COMMONWEALTH OF PENNSYLVANIA    :


            I, Beth A. Krupa, a Reporter Notary-Public,
authorized to administer oaths within and for the
Commonwealth of Pennsylvania and take depositions in the
trial of causes, do hereby certify that the foregoing is
the testimony of RONALD A. RILEY.

            I further certify that before the taking of
said deposition, the witness was duly sworn; that the
questions and answers were taken down stenographically by
the said Beth A. Krupa, a Reporter Notary-Public, approved
and agreed to, and afterwards reduced to typewriting under
the direction of the said Reporter.

            I further certify that the proceedings and
evidence contained fully and accurately in the notes by me
on the within deposition, and that this copy is a correct
transcript of the same.

            In testimony whereof, I have hereunto
subscribed my hand this <u>15th</u> day of <u>January</u>, 2001.




                          _____
                          Beth A. Krupa, Reporter
                                Notary Public



My commission expires
on April 27, 2002.

GEIGER & LORIA REPORTING SERVICE, 2408 PARK DR., SUITE B, HBG., PA 17110   717-541-1508 OR 1-800-222-4577

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD A. RILEY,                          :
                                          :
            Plaintiff                     :
                                          :
        v.                                :    No. 1:00-CV-0485
                                          :    (Judge Rambo)
MARTIN HORN, et al.,                      :
                                          :
            Defendants                    :

### CERTIFICATE OF SERVICE

I, Maryanne M. Lewis, Deputy Attorney General, hereby certify that on this date I caused

to be served the foregoing Documents in Support of Defendants Motion for Summary Judgment,

by depositing a copy of the same in the United States mail, postage prepaid, in Harrisburg, PA.,

addressed to the following:

Ronald A. Riley, #AK-8743
SCI-Huntingdon
Drawer R
1100 Pike St.
Huntingdon, PA  16654-1112

**MARYANNE M. LEWIS**
**DEPUTY ATTORNEY GENERAL**

**DATE:  March 29, 2001**